Finnerty, Appellant, *v.* Darby.

Argued Oct. 4, 1957. Before JONES, C. J. BELL, CHIDSEY, MUSMANNO, ARNOLD, JONES and COHEN, JJ.

*John E. Evans, Jr.,* with him *Martin Goodman* and *Evans, Ivory & Evans,* for appellant.

*Sanford M. Chilcote,* with him *David J. Armstrong* and *Dickie, McCamey, Chilcote & Robinson,* for appellee.

OPINION BY MR. JUSTICE CHIDSEY, January 16, 1958:

As a result of a collision between an automobile owned and driven by the plaintiff James W. Finnerty and a truck owned by the defendant Carmeletta V. Darby, doing business as Darby Transfer and Storage, and driven by the latter's employe, Harry Lloyd Cooke, plaintiff brought this action in trespass to recover for personal injuries sustained and damage done to his car. The defendant filed a counterclaim for damage

done to the truck. At the end of a lengthy trial the jury tendered a verdict which read: "Both parties were guilty of contributory negligence". With the approval of the jury and acquiescence by counsel, the court molded the verdict so as to be read and entered: "And now, to wit: January 24, 1957, we, the Jurors empanelled in the above entitled case, find Both parties were guilty of contributory negligence and find a verdict against the Plaintiff and in favor of the defendant and with respect to the counterclaim a verdict in favor of the Plaintiff and against the defendant." Plaintiff filed a motion for a new trial which, after argument before the court en banc, was refused and judgment duly entered on the verdict. This appeal by plaintiff followed. Defendant does not appeal.

Appellant contends here as in the court below that the trial judge erred in admitting the testimony of three witnesses as to the speed at which plaintiff was travelling and that the charge of the court was inadequate. A review of the testimony is desirable for a proper consideration of these contentions, none of which we find to be well founded. The accident happened on February 11, 1953 on Route 22 known as the William Penn Highway, in Indiana County, a few miles east of Armagh near the home of one Harry Rummel. Route 22 which runs east and west was at the time a two-lane blacktop highway, the paved portion being about 22 feet in width. The accident happened on a straight, almost level stretch of the highway about 2,000 feet long, referred to in the testimony as a plateau. According to the plaintiff, the accident happened about 6 P. M. Cooke, the defendant's driver, placed the time as 5:30 P. M. Throughout the afternoon and at the time of the accident there was a precipitation, variously described by the witnesses as rain, rain and snow, drizzle and sleet, accompanied by a high wind. As a

result the highway was wet and slippery. Harry Rummel who arrived at the scene of the accident very shortly thereafter, called by plaintiff as a witness, said: "The road was terribly slippery. You just couldn't stand up on it. . . ." Albert M. Luther who operated the tow truck that removed the vehicles after the accident, called by plaintiff as a witness, said: "It was kind of raining sleet". "It was icy out where the wreck was . . . awfully slippery". John V. Lyons, Jr., a witness called by the defense, who had been operating a car westwardly on the highway and had become involved in an accident at the same point very shortly after the collision between plaintiff's and defendant's vehicles, said: ". . . I had to stop about every mile to clean my windshield off of snow, sleet or whatever it was. It was freezing on my windshield.", that the road was "icy", the road conditions "were the worst I have ever driven in". Harold R. Kuczynski, a passenger in Lyons' car, said the rain was freezing on the road; ". . . it was icy in spots and probably very deceptive because the road was wet. You couldn't discern just where it was icy and where it was wet". Arthur Minarcin, a State Policeman who got word of the accident by radio and proceeded immediately to the scene, driving through Homer City to Armagh and thence about four miles eastwardly on Route 22 to the place where the accident happened, said that it was raining and when the rain hit the road it froze; that "The highway itself was a sheet of ice."

There were only three eye witnesses to the accident—Cooke, the driver of the defendant's truck, the plaintiff and Harold S. Lang, a passenger in the plaintiff's car. The latter was a Government expediter and inspector and had been associated with the plaintiff from two to four months in connection with a Government contract in which the plaintiff was interested.

Earlier in the day the two of them went from Altoona to Wilkinsburg in connection with work being done on this Government contract by a sub-contractor. They left Wilkinsburg at about 4:15 P. M. on the afternoon of February 11, 1953 on their way back to Altoona.

Plaintiff testified that it was raining and snowing during the trip back and most of the time he had his windshield wipers working. When asked by his attorney as to the general condition of the highway as he drove eastwardly on Route 22 from Wilkinsburg, he testified: "The road was wet. It wasn't icy. Some place along through there, well, not icy, it was like scum like you get on to grease, just enough to give you a movement of your automobile other than normal, other than the normal rolling or forward—it wasn't icy."; that before reaching the 2,000 foot straightaway or plateau above mentioned there was a dip, then a rise in the road and when he got to the top of the rise and was entering on the plateau he saw the lights of an approaching car in the distance; that he was then about 300 or 400 feet from the Rummel house, travelling in the eastbound lane; that he was in high gear but his speed was not greater than 25 miles an hour; that when he reached the Rummel house his car went into a spin counterclockwise, the rear swinging around so that after proceeding two or three car lengths the car crossed the westbound lane and continued on to the berm on the north side of the road and was facing west, the direction from which he had come. He claimed that his engine had gone dead during the spin, that his car came to a stop and that he was attempting to start it; that he pushed the starter button located on the dash and disengaged the clutch (which he said took him 15 seconds to accomplish) when there was a "terrific impact or whack to the car". From his testimony his car at the time of impact was from 150 to

200 feet beyond (east of) the Rummel house, in front of which he had started to skid.

Cooke, the driver of the defendant's truck who had made a delivery at Altoona, left there about 3 P. M., and was returning to Pittsburgh, driving westward on the westbound lane of Route 22.. He was familiar with the road and had driven trucks over it for the same employer for 19 years. He testified that it was drizzling and turning to ice and the road was "all icy"; that after he came up a slight rise in the road and was travelling across the plateau or level stretch above referred to, he saw the plaintiff's car about a half mile away; that it dipped out of his view and then he saw it again when it came up the rise onto the west end of the level straightaway; that when plaintiff's car was some 20 to 25 yards away it swung crosswise on the road in a counterclockwise direction directly in the path of the truck; that he, Cooke, to avoid the plaintiff's car, immediately drove his truck onto the right or north berm which was about 10 feet wide at that point; that plaintiff's car continued to swing around, went out onto the north berm and while travelling backwards, collided into the front of the truck with its rear end; that when plaintiff's car was leaving the icy road and coming onto the berm, Cooke applied his brakes and slid half a truck length (the truck was from 20 to 25 feet in length) to the point of impact. Before plaintiff's car began to skid Cooke had his truck in the next lower gear to high and was travelling at 20 miles per hour while plaintiff's car was going 50 to 60 miles per hour; that when the two vehicles collided plaintiff's car was moving backward toward his truck. Plaintiff's counsel made no objection to Cooke's testimony regarding the speed of plaintiff's car and, as said by the court below, "There could hardly have been one made since the witness was an ex-

perienced driver and apparently had ample opportunity to observe the plaintiff's car before it began to skid."

It was undisputed that after the collision both vehicles were completely on the north berm, facing west, the plaintiff's car being embedded in and under the front of the truck, the front bumper of which rested against the front seat of the plaintiff's four-door sedan. The testimony was conflicting as to whether the accident occurred while it was still daylight or dark. The plaintiff testified that he had to turn his headlights on when he left a gas station where he had his gas tank filled just west of Armagh and that it was no longer daylight when he got to Armagh, four miles west of the scene of the accident. Plaintiff's passenger Lang in his deposition hereinafter more fully referred to, said that when the accident happened ". . . it was about dusk", and he did not know whether plaintiff had his headlights on. Cooke testified that it was still daylight, that he did not have his lights on nor did the plaintiff. Mervin Ling, one of a State Highway crew which subsequently engaged in ashing the highway, testified that he saw a car which the jury was justified in finding to be plaintiff's proceeding eastwardly at a speed of 50 miles an hour at a point about a quarter or half mile west of the point of accident; that he walked to his home about an eighth of a mile north of the highway where he was picked up by the driver of the ashing truck and driven back to the highway; and that it was his belief that it was then "just getting dark". Plaintiff testified that the distance from Wilkinsburg to Altoona was 90 miles and that from Wilkinsburg to the scene of the accident "not over 60 miles". He said the stop at the gas station for gasoline took 5 minutes. Since the jury could find that the accident occurred at 5:30 P. M. as Cooke testi-

fied, it appears that it took Cooke, who left Altoona at 3 P. M., two and one-half hours to travel 30 miles, while plaintiff, who left Wilkinsburg at 4:15 P. M., covered the 60 miles to the scene of the accident in an hour and 10 minutes (deducting 5 minutes for the stop at the gas station). Route 22 was not a turnpike or limited-access highway.

The testimony of plaintiff's passenger Lang contradicted the plaintiff's statement that his car came to a stop before the collision. Both men were knocked unconscious by the impact. Lang testified that "When I lost consciousness the [plaintiff's] car was still moving." This was in accord with Cooke's account of the collision. Lang's testimony also established that plaintiff was driving substantially in excess of 25 miles per hour. On the morning following the accident plaintiff informed Minarcin, the State Policeman who investigated the matter, that he was travelling 40 miles per hour when his car began skidding.

The court carefully and properly instructed the jury that skidding of itself did not establish negligence but that negligence could cause skidding and the resulting consequences; that the question for the jury to determine was whether the plaintiff was travelling at a reasonable or an excessive rate of speed under the weather and road conditions prevailing. Plaintiff's counsel makes no complaint of the charge in this regard. Although one of the reasons assigned in plaintiff's motion for a new trial was that the verdict of the jury as it affected the plaintiff was against the weight of the evidence, such reason is not pressed. And advisedly so, for the evidence fully justified a finding by the jury that under the extremely slippery condition of the highway plaintiff was driving at an excessive, if not indeed a reckless rate of speed. Plaintiff's contention is that the court erred in admitting the testi-

mony of the witnesses Lang, Ling and Minarcin as to plaintiff's speed.

Before discussing the testimony of these three witnesses, we note that the statement in appellant's brief that the jury must have relied upon the testimony of one or more of these three witnesses as to the speed at which plaintiff was travelling, is not well founded. The assertion is premised upon the fact that the jury found the defendant negligent and therefore rejected Cooke's version of the accident that placed the plaintiff's speed from 50 to 60 miles per hour. The jury did not have to accept the defendant's version of the accident in its entirety. "It is perfectly reasonable for the jury to believe so much of the testimony offered by a litigant as pertains to what the opposing party did, and disbelieve that part of the testimony as tends to absolve the litigant of liability.": *Antonelli v. Tumolo,* 390 Pa. 68, 73, 132 A. 2d 285. Moreover, under the weather and road conditions prevailing, the jury could have found that even driving at 20 miles per hour, the speed at which Cooke testified he was travelling, was negligent. Indeed they could have found that continuing to drive on the treacherous and highly dangerous road surface that existed until it was ashed or conditions bettered, was foolhardy. Neither vehicle had chains on its wheels. Both plaintiff and the defendant's driver had accomplished their missions and there was no compelling reason for haste on their return journeys.

We turn to the testimony of Lang, plaintiff's companion who sat in the front seat of the car, as to the speed at which they were travelling. Lang's testimony consisted of excerpts from his deposition* taken in Washington, D. C. at the instance of and offered in evidence by the defendant. A reading of Lang's entire

---

* At which both parties were represented by counsel.

testimony shows as the court below stated that he was a reluctant, if not a hostile witness. Appellant in his brief quotes portions of his testimony where, questioned as to the speed at which plaintiff's car was travelling, he answered, "I don't know". His entire testimony makes plainly apparent that he either did not want to testify to a rate of speed that would adversely affect the plaintiff or that he was under the misconception that he must be able to testify positively to the exact speed of the car, that is, the exact number of miles per hour. Appellant also quotes the following from Lang's testimony: "Q. What is your best estimate then, sir, of the speed of this car for a mile or so prior to the accident? A. (Pause.) Strictly as a guess I would say between 40 and 50 miles an hour." From this appellant argues that the witness' entire testimony was nothing but guesswork or mere conjecture. In the first place, the word "guess" does not necessarily mean mere conjecture, but may connote judgment. If a person is asked to estimate the number of people in a crowd, he may say "I guess" a certain number, or he may say "I judge" a certain number. By either term he is expressing an opinion based on observation. In the instant case the witness repeatedly made clear that he could not give the exact speed of the car, and was giving his best opinion of its approximate speed. We quote from the opinion of the court in *Commonwealth v. Forrey*, 172 Pa. Superior Ct. 65, at p. 70, 92 A. 2d 233:

"A witness for the Commonwealth in answer to the question: 'Do you have an opinion on the speed of the [defendant's] truck?' stated: 'I would say twenty-five to thirty *at a guess*, but due to the size of the truck it is pretty hard to arrive at that'. The court over objection allowed the answer to stand. There was no error in the ruling. A non-expert witness is competent to ex-

press an opinion as to the rate of speed of an automobile. Commonwealth v. Godshalk, 76 Pa. Superior Ct. 500. Regardless of the choice of words it is clear that the witness intended to express his opinion as to speed as best he could. . . ." (Emphasis supplied). And see *Commonwealth v. Aurick*, 138 Pa. Superior Ct. 180, 10 A. 2d 22.

Secondly, and more important after the witness unfortunately used the word "guess", he again and again, albeit reluctantly, expressed his judgment as to the plaintiff's approximate speed, especially after he was advised that he need not give the exact speed but could testify to a range within which the car was travelling. The witness testified positively that "We were going more than 25 miles an hour", which was the speed plaintiff said he was travelling. Thereafter there was testimony by the witness as follows:

". . . Were you going 35 miles an hour? The Witness: Well now, we are getting up in the area where I don't know. Those very slow speeds I mean I am pretty sure of that, you know, because that is just creeping along but I mean I don't know up around those speeds. We were probably going 35 miles an hour. Q. Your best estimate of the speed of Mr. Finnerty's vehicle, for one or two miles prior to this collision is 35 miles an hour? The Witness: (Pause) Well, that nails me down to the specific speed, I don't know. . . .

"The Witness: I would like to make a statement as to the speed and make it for the record if you want to. There are certain limits that I know that we were perhaps going within. But I mean now these very slow speeds like ten or fifteen miles an hour I know we were not going that and I know that at the time of the accident we were not going at an exceedingly high speed but there is a range in there that my memory tells me perhaps it might be in there. What I mean, I can't

pinpoint that. I mean it is going on two years now. Q. What is that range, sir? A. Well, I don't know, maybe 35 to 55, something in that order. . . .

"Well, I said maybe, that means to the best of my recollection. . . .

"By Mr. Martell [defendant's counsel] : If you don't know the exact speed in miles per hour give us a range in which the car was travelling. Now I thought you had indicated at one time that to the best of your recollection his car immediately prior to the accident was going from 35 to 55 miles an hour, am I correct? A. Yes, I indicated that on the basis that his car was neither going very slow nor very fast, in other words, I don't think he was going higher than 55, no."

The last question and answer were as follows: ". . . What is your best approximation of his speed immediately prior to the collision? A. (Pause) I give the figures 35 to 55 miles an hour as the best approximation of his speed on the basis that he was neither going very slow nor very fast at the time we started to skid." Under the deposition the jury certainly could have found that plaintiff was driving not over 55 miles per hour, but more than 35 miles per hour. In any event the testimony was admissible and its weight a matter for the jury. Absolute accuracy is not required to make a witness competent to testify to the speed of an automobile: See *Dugan v. Arthurs*, 230 Pa. 299, 303, 79 A. 626.

Appellant additionally contends that all of Lang's testimony as to speed was inadmissible because he was not qualified generally to express an opinion on the speed of an automobile, and not shown to have made any observation which would have enabled him to form an opinion as to the speed at which plaintiff's car was traveling. It is sufficient answer to this contention

that it is made for the first time in this Court. Appellant made no objection when Lang's deposition was offered in evidence, and appellant does not challenge appellee's statement that no such objection or contention was raised or argued before the lower court on plaintiff's motion for new trial. Under these circumstances the contention cannot be considered. A reason for granting a new trial which was not assigned in the court below cannot be considered for the first time on appeal: *Risbon v. Cottom*, 387 Pa. 155, 127 A. 2d 101, and cases cited therein. Moreover, by not objecting to the introduction of Lang's testimony when it was offered, plaintiff's counsel deprived counsel for defendant of the opportunity to qualify Lang by introducing those portions of the deposition which related to the witness's qualifications.

Lang's entire deposition was 65 typewritten pages in length. At first plaintiff proposed to offer a portion thereof in evidence. This offer was withdrawn when the court ruled that the defendant could also introduce other portions which the court held to be relevant. The defendant then proposed to introduce a portion of the deposition in defendant's case together with the portion desired by the plaintiff. At conference with the judge in chambers the court ruled on specific objections by plaintiff's counsel to the inclusion or exclusion of certain testimony contained in the portions of the deposition which counsel agreed should be introduced into evidence in accordance with such rulings, and the same were then read to the jury. At no time did plaintiff object to any part of the deposition on the ground that Lang was not qualified to express an opinion on the speed of an automobile. Indeed he was not in a position to do so because when the deposition was taken, defendant's counsel at the outset qualified the deponent as follows: "Q. Let me

withdraw that question and ask you this, sir. Do you drive a car yourself? A. Yes, sir. Q. For how long have you driven a car? A. Oh, my goodness! 24 years. Q. During those 24 years, sir, have you had an opportunity to estimate the speed of a car? A. Oh, sure. Q. Either the one you are traveling in or one that you see along the street? A. Sure." Under the circumstances it is anything but commendable for appellant's counsel to advance this contention in our Court.

The witness Mervin Ling testified that shortly before the accident occurred he was crossing the William Penn Highway on his way to his home which, as above stated, was about an eighth of a mile north of the highway and when he was "right along the road" he observed a blue Mercury automobile proceeding eastwardly on the highway at a point one-quarter or one-half of a mile west of the scene of the collision. He said the automobile was either a 1950 or 1951 model, that there were two men in it and it was travelling not less than 50 miles per hour. It was not disputed that plaintiff owned and was driving a blue 1951 Mercury car when the collision occurred. Ling had driven a car from 20 to 25 years and had an opportunity to watch the car drive by and judge its speed as he stood along the side of the road. As above related, he continued to his home where he was picked up by the cinder or ash truck which returned to the highway and proceeded eastwardly, ashing the road to a point some distance beyond the scene of the accident; that when the truck passed the scene of the accident he saw the vehicles that had collided, standing off the road on the north berm, the truck at the rear of the car and both facing west. Apparently because he did not actually see the collision he would not say that the car was the same one that had earlier passed him, but said it looked to him like a blue Mercury. On

cross-examination counsel for the plaintiff asked him: "Did I understand you to say you thought there was a blue Mercury there but you weren't sure?", and he answered: "No, it looked to me like a blue Mercury." Appellant suggests that a blue Mercury car is a common type of car and that the car which the witness saw passing him was not sufficiently proven to be plaintiff's car. There was no evidence of any car other than the plaintiff's proceeding eastwardly or westwardly in the vicinity prior to the approach of the car of the witness Lyons from the east, which was involved in an accident at the same point after the collision between the plaintiff's and the defendant's vehicles. Cooke saw only the plaintiff's car approaching from the west. The plaintiff testified to no other vehicles passing him in either direction and Lang testified that he saw no cars ahead or in back of the plaintiff's car.

However, plaintiff contends that assuming that it was plaintiff's car which the witness Ling observed going by, his observation as to its speed was too remote from the scene of the collision to be relevant. This Court has frequently ruled that testimony as to the speed or operation of an automobile at a point near and a short time before the collision is admissible and relevant to the issue of the speed of the vehicle at the time of the accident. Such evidence is admissible, its weight and credibility being for the jury: *Shellenberger et al. v. Reading Transportation Co.*, 303 Pa. 122, 154 A. 297; *Gerhart v. East Coast Coach Co.*, 310 Pa. 535, 166 A. 564; *Rooney v. Maczko*, 315 Pa. 113, 172 A. 151; *Commonwealth v. Pennzoil Company*, 358 Pa. 221, 56 A. 2d 93; *Pierontoni v. Barber*, 384 Pa. 56, 119 A. 2d 503. Whether the evidence of speed is too remote in time and distance depends upon the facts in each case, and to an extent whether it is the only

evidence or is corroborative of other admissible evidence of speed.

In *Shellenberger v. Reading Transportation Co.,* supra, a witness saw the defendant's bus pass about 900 feet from the scene of the accident. The court held that the witness's testimony as to the speed at which the bus was travelling was admissible in corroboration of the testimony of the plaintiffs as to the speed. In *Commonwealth v. Pennzoil Company,* supra, the testimony of a witness who saw a truck passing about 480 feet from the scene of the accident was held admissible, the court citing the *Shellenberger* case and the *Gerhart* case, supra. In the recent case of *Pierontoni v. Barber,* 384 Pa. 56, supra, wherein also we cited the *Shellenberger* case, testimony concerning the speed of a vehicle at a point 750 feet distant from the point of collision was held admissible.

Remoteness of the evidence is not determinable by distance and time alone, but as we have just said, depends upon the facts in each case. No exact limitation of distance or time can be fixed. Where the accident occurs in a city, for instance, with intersecting streets and traffic, evidence of a speed at a comparatively short distance before the accident may be too remote, whereas in rural areas evidence of speed at a greater distance may be relevant. In the instant case plaintiff was traveling in a rural area. There is no evidence of any intersecting roads, any traffic or curves which would have caused plaintiff to lower his speed during the half mile in question. Appellant states that no case can be found that would permit evidence of speed by a witness at a point so far distant as a half mile. On the other hand, appellant cites no cases nor does our search reveal any where this Court has placed any limitation upon the distance involved or period of time that has elapsed. If the only evi-

dence of plaintiff's speed was that of the witness Ling that the plaintiff's car when it passed him was travelling 50 miles an hour, appellant's objection to the admissibility of such evidence might be considered well taken. But here not only was there the evidence of the defendant's driver Cooke that plaintiff was travelling 50 miles an hour immediately before the accident occurred, but evidence from which the jury could conclude that plaintiff maintained the same rate of speed from the point where the witness Ling saw him, to the scene of the accident. Plaintiff who testified he was going not over 25 miles an hour as he entered the level straightaway which he put at 500 or 550 feet from the point of collision, did not testify to any change of speed during the half mile in question, and plaintiff's companion Lang who was seated in the car beside the plaintiff not only testified that immediately before the accident plaintiff's car was going between 35 and 55 miles per hour, but at another point in his testimony, when asked for the best estimate of the speed of the car *"for a mile or so* prior to the accident", said between 40 and 50 miles per hour.

Appellant cites cases in this regard that are readily distinguishable. In those cases the testimony of the witness at some place prior to the accident was the only evidence of speed or the car which passed the witness was not sufficiently identified as the car involved in the accident or the witness did not have sufficient opportunity to estimate the speed. *In no one of them was there evidence, as here, that the approximate speed of the vehicle testified to by the witness was maintained from the point where the witness saw it to the point where it became involved in the accident.* The objection to the testimony of a vehicle's speed at a place and time substantially distant from the scene of the accident as evidence of the speed at the time of

the accident is that it rests upon speculative inference. In the instant case that plaintiff maintained the same rate of speed—excessive under the weather and road conditions prevailing—does not rest upon inference but upon the direct testimony of Lang, the passenger in the plaintiff's car.

Ling's testimony, when considered in connection with that of Lang, was clearly admissible as corroborative of the testimony of the defendant's driver, Cooke.

As above stated, Arthur Minarcin, a member of the State Police who investigated the accident in his official capacity, interviewed the plaintiff at the hospital in Johnstown where both plaintiff and his passenger Lang were taken after the accident and obtained a statement from the plaintiff as to how the collision occurred. It is contended that as the result of the serious injuries plaintiff received, his condition was such as to render inadmissible the officer's testimony in this regard. In his brief counsel for appellant attacks the credibility of the officer because the latter at first mistakenly testified that he interviewed the plaintiff at the hospital during the evening of the accident. Later Minarcin who was at the hospital both on the night of the accident and the next morning, testified that the interview took place on the latter occasion, as was testified to by Mrs. Burkhardt, a nurse and clinical instructor at the hospital. Minarcin recalled that he was not allowed to talk to the plaintiff on the evening of the accident, but got such permission the next morning. It is not disputed that Minarcin was at the hospital and did obtain a statement from plaintiff which was reduced to writing and signed by Mrs. Burkhardt, the nurse then in attendance, as a witness. This statement which was read to the jury by Minarcin and later introduced into evidence, was as follows: "I was traveling east on Route 22 going about 40 miles

an hour. I came down this grade and went into a skid on the opposite side of the highway and faced the other direction as there was a truck coming in the westbound lane and he collided in the rear of me." Minarcin testified that the statement followed his questioning of plaintiff as to what had occurred; that he then wrote it down, requested Mrs. Burkhardt, the nurse, to sign the statement after it had been read back to and approved by the plaintiff in the presence of both Mrs. Burkhardt and the officer. Mrs. Burkhardt fully corroborated the officer in this regard.

When the plaintiff was admitted to the hospital at 7:09 in the evening, he was suffering from shock and in an unconscious condition. He was so severely injured that his life was dispaired of and a rosary having been found upon his person, the last rites were administered to him while unconscious. His tongue was sutured to his cheek to facilitate breathing. As stated by the court below, his recovery was almost miraculous and no doubt due to the medical care he received and a very strong constitution. Both the hospital records and the testimony of Mrs. Burkhardt were to the effect that for a number of days following he was mostly in an unconscious or semi-conscious state. He was, however, at times conscious and comprehended what was said to him and observed his surroundings. This was true, the nurse testified, when Minarcin obtained the statement at approximately 8 o'clock on the following morning. She testified that she did not recall whether plaintiff talked to her that morning, but said he showed "recognition of anything asked of him"; that she remembered his complaining of a pain in his chest which she reported to the doctor. She testified that anchoring the tongue to the cheek was often done to prevent suffocation. She also said that "When a tongue is secured to the cheek it is not usually secured

in such a way that the patient is unable to swallow, and your tongue is used in swallowing and if he can swallow he can have some motion of the tongue." When asked on cross-examination whether the plaintiff talked clearly that morning, her answer was "No, but he could have given enough of an answer or indicated an answer to any questions that were put to him.", and that when the officer was in plaintiff's room "Mr. Finnerty appeared to be conscious".

The hospital record read into evidence, covering the nurse shift from 7 A.M. to 3 P.M. on the day following the accident, stated: "Patient sipped a little juice at breakfast. Drank 240 cc's of tea at lunch." As Mrs. Burkhardt explained, "240 cc's is one glass, eight ounces." It does not definitely appear whether the plaintiff was prone or in a sitting position when the officer interviewed him. Mrs. Burkhardt who was familiar with the hospital record which stated that plaintiff "had blood in his chest and lung", testified that for that reason the doctor "wanted him in an upright position rather than a flat position which is common for any head injury: ordinarily we keep them flat in bed." Minarcin testified that he did not know the extent of plaintiff's injuries nor that he had his tongue anchored to his cheek; that plaintiff had heavy breathing of which he complained, but that he, Minarcin, did not have trouble in understanding plaintiff's words when he uttered them. Mrs. Burkhardt testified that she heard Minarcin read the statement to the plaintiff who apparently comprehended what was being said to him and after it was read, indicated his approval by nodding in the affirmative, and that at the request of the officer she signed her name to the statement.

Dr. Kahl who attended the plaintiff from the time he was brought to the hospital and thereafter, testified

at great length and in minute detail as to plaintiff's injuries and his progress. He attended the plaintiff on the morning after the accident and therefore was in a position to testify as to the plaintiff's ability to understand the officer's questioning and intelligently respond thereto. He was not called in rebuttal after Minarcin's and Mrs. Burkhardt's testimony as presumably he would have been if he was of the opinion that plaintiff's physical or mental condition prevented him from understanding and responding to the statement taken by Officer Minarcin.

The police officer and the nurse were entirely disinterested witnesses and we are of the opinion that the court committed no error in admitting their testimony. Of course the weight of their testimony was for the jury. The statement contributed little other than the admission that plaintiff was travelling at 40 miles per hour. The jury may have given little or no weight to this admission for there was other and ample testimony that plaintiff was travelling at a speed in excess of 40 miles per hour.

Appellant contends that the statement should not have been received in evidence because the witness Minarcin used it merely to refresh his recollection and it was not established that his memory was entirely embodied in the statement so as to make it admissible as an instrument of prior recollection recorded, citing *Miller v. Exeter Borough*, 366 Pa. 336, 77 A. 2d 395. The general rule relied on by plaintiff is not here applicable. The statement was an admission by the plaintiff and admissible as any other unsigned or oral statement by the plaintiff would have been. In the strikingly similar case of *Commonwealth v. Moon*, 389 Pa. 304, 132 A. 2d 224, the defendant after killing his victim, fled and when apprehended shot himself in the neck, from which he nearly bled to death. The bullet

also shot away a part of his tongue. The next morning an unsigned statement was obtained from him by police officers in the same manner as the statement was obtained by Minarcin in the present case. Moon was then unable to speak. In passing on the contention that the statement was not admissible, we said at p. 309: ". . . the defendant objects to the memorandum made by Commonwealth's witness during an interview with the defendant while he was in the hospital. This memorandum was not signed or written by the defendant, nor is such necessary. The defendant was unable to speak due to his self-inflicted wounds and was instructed to nod his head yes or no, and to hold up fingers to indicate 'how many.' The memorandum was clearly admissible just as an unsigned or oral statement of the defendant would have been. Its weight was for the jury, and the defendant was not harmed by the admission in evidence of the memorandum. . . ."

We find no merit in appellant's complaint as to the charge of the trial judge. Appellant quotes isolated portions of the charge, but a reading of the entire charge (see Sherman v. Manufacturers Light and Heat Company, 389 Pa. 61, 67, 132 A. 2d 255) refutes and shows to be entirely unwarranted the appellant's assertion that it "almost completely ignored" the plaintiff's version of the accident and constituted "a one-sided presentation of the controverted facts". The charge covers 26 pages of the record. We find it fair and impartial, especially in view of the fact that in our opinion the weight of the evidence militated heavily against plaintiff's version of the accident. A trial judge is not required to refer to the testimony of every witness in reviewing the evidence in the case nor refer to every contention made by counsel in his presentation to the jury. Counsel can always request amplification of the charge, and that is exactly what happened here.

At the conclusion of his charge the court asked if there was anything he should correct. Appellant's counsel then said he had several suggestions and the court thereupon charged on some six special matters which plaintiff's counsel felt to have been neglected. Counsel for plaintiff thereupon said "That covers my list, your Honor. I have no other suggestions. . . .". Counsel was apparently satisfied with the additional instructions for he asked for no further instructions. Under such circumstances, in the absence of basic or fundamental error—and we find none—a new trial will not be granted: See *Risbon v. Cottom,* 387 Pa. 155, 127 A. 2d 101; *Pryor v. Chambersburg Oil and Gas Company,* 376 Pa. 521, 103 A. 2d 425.

This case was tried by very able counsel before a very able and experienced judge. Despite sympathy for the plaintiff which his serious injuries must have engendered, the jury found him guilty of negligence. A painstaking review of the evidence is convincing that there was no trial error and that the verdict of the jury against the plaintiff was eminently just.

Judgment affirmed.

Mr. Justice BELL dissents.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

The decision of the Court in this case not only works an injustice against a present litigant but shatters established rules of law into such fragments that they will remain to clog and impede the machinery of trial procedure so as to imperil justice in similar cases in the future.

On the night of February 11, 1953, James W. Finnerty, victim of a highway accident, was taken by

ambulance to the Lee Hospital in Johnstown suffering such injuries, fractures, and loss of blood that his life was despaired of. His brain was damaged, his right hip fractured, and his left facial muscles, tongue, eyes, and lips were in paralysis. His tongue was so twisted that he was choking to death. The hospital doctor pulled it out, passed a needle through the center and sewed it to his cheek so that he might not swallow it and strangle. He bled profusely from extensive and multiple scalp gashes. He bled from the nose, mouth and ears. He was emitting frothy mucus from his lungs which had suffered rupture. His abdomen was distended. Some 14 inches of muscle and skin were torn from his back, exposing the bone. A hematoma on his back measured "about the size of a pumpkin." His heart muscle faltered. A blood clot hemorrhage congested the frontal area of the forehead. His left eye was hidden behind an extensive hematoma. His right leg was so distorted that the heel was where his toes should be. The pelvis was fractured, and the sciatica nerve was torn loose from its moorings. (There is a reason for listing these harrowing details which will soon become evident). He suffered from a severe comminuted fracture of the clavicle. Three ribs were fractured. Severe internal abdominal injuries induced vomiting of blood. The sacrum, base of the spine, was fractured. The head of the femur had broken into the pelvis and ruptured the bladder. Lacerations, gashes, and contusions covered his entire body. He had "a partial left hemaplegia, partially paralyzed with loss of his speech, taste, his vision and his auditory function, that is his senses, that is the hearing." After enumerating these items, which I have considerably abbreviated, Dr. H. T. Kahl, the attending physician, testifying at the trial, said: "the patient was unconscious for five days, six days."

It seemed so certain that the patient could not survive his disaster that the last rites of the church were administered to him. It was while this mass of fractures, ruptures, dislocations, and pulverized flesh was lying in the hospital in total shock, unable to speak, see, or hear, and hanging on to life by a mere thread, that there was accomplished, in the name of the law, a flagrant violation of human and constitutional rights which is distressing to note and appalling to contemplate. A State policeman by the name of Arthur Minarcin entered the hospital room of this wrecked human being and proceeded to interrogate him. He then wrote up a statement, presumed to have been drawn from the bleeding ruin before him. The paper read as follows: "I was travelling east on Route 22 going about 40 miles an hour. I came down this grade and went into a skid on the opposite side of the highway and faced the other direction as there was a truck coming in the westbound lane and he collided in the rear of me." He then asked a nurse to hear him read the paper to the figure in the hospital bed. And when this was done, the anatomical debacle before him "merely motioned with his head."

At the trial which followed, this so-called "statement", in an amazing and incredible trial ruling, was introduced in evidence as a statement made by the nearly dead man. It was not only introduced in evidence but it was allowed to go out with the jury as an exhibit!

Exhibit of what?

It was not pretended that Finnerty had written the "statement," there was no evidence that he had spoken the words in the "statement," and there was no indication that he understood what it said, if we can even assume that he heard it.

326

Let us see what this case is about. On the afternoon of February 11, 1953, James W. Finnerty was driving his Mercury automobile in an eastward direction from Wilkinsburg to Altoona over Route 22, also known as the William Penn Highway. When he arrived at a point about three miles east of Armagh in Indiana County, and in the vicinity of a house owned by a Harry Rummel, his car, because of the slipperiness of the road, due to rain and possibly some sleet, went into a skid, which took him across the highway, so that when his car stopped he had made a half turn and was now facing westwardly on the north berm of the road, five to six feet off the paved portion. He remained in this presumably safe position for about 15 seconds, endeavoring to get his car started again, when a truck belonging to the defendant, Darby Transfer and Storage, and being operated by Harry Lloyd Cooke, crashed into the rear of his car, demolishing it and visiting on him the mangling injuries already described. Finnerty sued Darby Transfer and Storage for his personal injuries, and the Darby Transfer firm sued him for the truck damages. The jury returned a verdict finding both drivers guilty of contributory negligence and thus not entitled to recover. Finnerty appealed, alleging various serious trial errors.

In court, Finnerty, who by a miracle did not die, testified that from the time he left Armagh he did not travel at a speed greater than 25 miles per hour. Cooke, the truck driver, testified that just before Finnerty's car began to skid, it was travelling at 55 to 60 miles per hour, while he, on the other hand, was moving only at 20 miles per hour. The jury found Cooke negligent which meant, therefore, that they did not believe his account of the accident. Thus, had it not been for the fact that the jury also found Finnerty negligent, Finnerty could well have obtained a verdict

against the owners of the truck. The whole issue in the case, therefore, narrowed down to the query as to whether or not Finnerty drove his car at an excessive rate of speed under the circumstances, since *that* was the only charge of negligence against him. In this state of affairs, the Trial Judge should have been extremely circumspect to keep the testimony within the accepted rules of trial evidence and within constitutional limitations. Whether he did so, will be seen as the discussion develops.

At the trial, Officer Minarcin testified that while on regular patrol duty the evening of February 11, 1953, he learned at 5:50 p.m. that an accident had occurred 20 minutes before, near the Rummel house several miles from Armagh on Route 22. He proceeded to the point of the collision and there made an investigation. He questioned Cooke, the driver of the defendant's truck, and others on the scene. Finnerty had already been taken to the hospital. Minarcin then drove to the Lee Hospital in Johnstown where, he said, he obtained permission of the nurse to question Finnerty, that he put questions to Finnerty and that Finnerty orally gave him a statement, which he reduced to writing, and which he then read back to him. He said further that the nurse on duty, Colleen Harshberger (later Mrs. Burkhardt) witnessed the "statement."

But Nurse Burkhardt took the witness stand and testified that she was not on duty the night of February 11th, and that she gave him no permission to enter Finnerty's room. After Minarcin's testimony about what happened in Finnerty's room on the night of February 11th had been completely demolished by the nurse, Minarcin re-mounted the stand and said he had made a mistake. It all occurred the morning of February 12th, he said.

But Minarcin had no right to be in Finnerty's room either the night of the 11th or the morning of the 12th. The nurse testified: "I was quite upset with his [Minarcin's] being in the room at the time because Mr. Finnerty was in critical condition." She said further that the doctor in attendance asked Minarcin to leave the room.

Minarcin's questioning of Finnerty amounted to coercion. To obtain a statement by pointing a revolver at one's victim is no more illegal than interrogating a person who is so ill and disabled that he cannot be aware of what is being said to him and has no consciousness of what his babbling lips might say.

Moreover, the record amply justifies the finding that Finnerty was in no condition to speak either the night of February 11th or the morning of February 12th. We will recall that Finnerty's doctor testified that Finnerty was unconscious for five or six days. The nurse explained that Finnerty was in a critical condition for a week or ten days. She said further that Finnerty "was given the last rites of the church without his knowledge simply because a rosary was found in his pocket. *He wasn't able to be asked* at that time whether he wished to have them, and they administered the last rites due to his condition."*

The nurse also testified that during all the time that she was in the room with Minarcin she did not hear Finnerty "say a single word to the policeman." She pointed out further that: "He wasn't able to actually speak." The hospital records on Finnerty carry an entry as of February 12th: "Still unconscious. Unable to X-ray condition."

I have no hesitation in stating, after studying the record, that it was sheerly physically impossible for

---

* Italics throughout, mine.

Finnerty to have uttered the words attributed to him by Minarcin. I repeat what Minarcin said Finnerty said: "I was travelling east on Route 22 going about 40 miles an hour. I came down this grade and went into a skid on the opposite side of the highway and faced the other direction as there was a truck coming in the westbound lane and he collided in the rear of me."

It will be recalled that when Minarcin read the "statement" to Finnerty, Finnerty "merely motioned with his head." It was the nurse who described this scene and there is no reason to question her credibility. On what basis can it be assumed that Finnerty knew what was being said to him? And by what possible line of physical logic can it be argued that Finnerty actually spoke the words Minarcin attributed to him? If Minarcin had testified that Finnerty had replied to his questions with motions of his head, it could be argued in his behalf that Minarcin possibly wrote up the "statement" by interpreting those head motions. But I must say that, if such an explanation had been presented, Minarcin would have experienced some difficulty in explaining to me what kind of a nod Finnerty made in saying that he was travelling east on Route 22; what form of head signal he employed in relating that he was moving at 40 miles an hour; what specialty of head movement he utilized in telling Minarcin he came down a grade and went into a skid on the opposite side of the road; what manner of head gyration informed Minarcin that Finnerty faced the other direction; and with what kind of a facial grimace he went on to explain that a truck came along westbound in the westbound lane and collided with Finnerty, etc., etc. It must be kept in mind that these nods were supposed to have been made by a man with extensive brain damage, when the slightest movement

of the head would have created excruciating pain and dizziness; also when he was unconscious or only semi-conscious.

If the Trial Judge had properly charged the jury in this connection, which an inspection of the charge will reveal he did not, the jury could well have concluded that the information contained in the so-called statement came not from Finnerty but from what Minarcin had picked up at the scene of the accident, and particularly after talking to the defendant's driver Cooke.

Even if we were to assume that Minarcin had talked to a person in a dying condition and that some babbling responses had been reduced to writing, on what possible legal basis could such a paper be introduced in evidence? Minarcin could presumably testify to what he did and what he said and what he heard, but where is the law which permits a self-serving paper to be introduced when the witness is present to testify to what was said and what was done?

If Minarcin had testified that he remembered talking to Finnerty but could not recall what Finnerty had said, but knew that he had faithfully recorded Finnerty's words at the time they were spoken, then the memorandum could have been introduced as evidence of what Minarcin said Finnerty had said. But that is not the case here. Minarcin testified to what he did, saw, and heard that evening. The paper was utterly self-serving and had no more legal standing in court than an essay Minarcin might have written. In the case of *Moerlein Brewing Co. v. Rusch*, 272 Pa. 181, 187, this Court said: "Where a witness has a present recollection of a past event, although his memory is refreshed by a memorandum made at the time of the event, *he testifies from such recollection;* but where he has no present recollection of such past event, even when aided by his memorandum, the latter itself may be

offered in evidence, on proof by the witness of his knowledge of its accuracy when made and that it was made when the transaction was fresh in his mind."

In the case at bar the witness had a present recollection of a past event. This was the original evidence. The paper itself was only secondary evidence. Thus, before it could be introduced as an exhibit, the defendant had to show and prove that the witness had no recollection of the event narrated. No such groundwork was laid.

The error of admitting the "statement" was compounded when the Trial Judge allowed it to go out with the jury. Thus, the jury was permitted to believe that they could accept this paper as gospel of what Finnerty said, and, in the privacy of the jury room, to concentrate on it as an official document. Nor did the Trial Judge in his charge say anything to bring the paper back to its trivial probative importance.

It would seem clear, under the authorities, that the "statement" should not have been admitted in evidence and under no circumstances should it have accompanied the jury into the jury room. At the very least, the Trial Judge should have instructed the jury to approach this "statement" with circumspection. One would expect that he would have told them the extraordinary circumstances under which it was written, that he would have called to their attention the fact that the doctor, the nurse, and that the medical evidence indicated that at the time the "statement" was supposed to have been taken, the patient was unconscious—but of all this there is nothing in the charge.

There is no doubt in my mind that the jury accepted Minarcin's fantastic story only because the Trial Judge allowed them to believe it was proper for the officer to write up what he could not have heard, read his own composition to a man at the very brink of the

grave, and then charge him with utterances he had not made, only because, as the nurse testified, at one point of the gratuitous visit the nurse saw Finnerty make a motion with his head. It did not occur to anyone apparently to tell the jury that that motion might have been an involuntary reaction to pain, or even that the patient was trying to tell the policeman, what the doctor told him, namely, to get out of the room, and let a dying man die in peace!

And this Court, instead of granting a new trial forthwith on so amazing a record, on so clearly established a deprivation of a citizen's rights, and on so flagrant an abuse of discretion on the part of the Trial Judge, places its stamp of approval on the whole astounding procedure by making various assertions which, I submit, do not in the slightest support the defendant's position that Finnerty spoke the words attributed to him. The Majority Opinion, to begin with, says that "It is not disputed that Minarcin was at the hospital and did obtain a statement from plaintiff which was reduced to writing . . ." But it is emphatically disputed that Minarcin did any such thing. The plaintiff disputes Minarcin's testimony categorically in this regard, and much of the testimony from which I have quoted disputes Minarcin's narrative.

The Majority Opinion says that Nurse Burkhardt testified that Finnerty "showed 'recognition of anything asked of him'; that she remembered his complaining of a pain in his chest which she reported to the doctor." This assertion on the part of the Majority suggests that Finnerty spoke to the nurse, complaining about a pain in his chest and that he could carry on a conversation by recognizing "anything asked of him." But this is what the record shows: "Q. Could he talk if his tongue was sewed to his cheek? A. He could show recognition of anything asked of him. Q. Could

he speak though? A. I can recall of him designating that he was having a pain in his chest. Q. How did he do that? A. I can't recall right now but at the time because the thing was brought up when the doctor came into the room I asked him if he could have something for this pain and cough that Mr. Finnerty had developed and the doctor informed me that he felt that he possibly had rib injuries that were causing the irritation and therefore he didn't want to too heavily sedate him. Q. Did Mr. Finnerty say 'Miss Harshberger [Mrs. Burkhardt's name before marriage], I am having a pain in my chest,' when you came in the morning of the 12th? A. I couldn't swear to that."

The Majority Opinion then goes on to say that, in answer to a question as to whether the plaintiff talked clearly that morning, the nurse replied: "No, but he could have given enough of an answer or indicated an answer to any questions that were put to him." The quotation is correct, but the Majority Opinion does not quote enough of the testimony to give an accurate reproduction of what the nurse said. I will refer to the record, quoting again what the Majority quoted but in its context as given at the trial, namely, "Q. Do you mean that he could have talked clearly with his tongue sewed to his cheek? A. No, but he could have given enough of an answer or indicated an answer to any questions that were put to him. Q. *You mean he could have shaken his head?* A. *Yes.* Q. I did not ask you if he could shake his head. I am asking you if he could speak clearly and enunciate words that morning in his condition as it was? A. I would say that it would depend on the patient. Q. Well, I am talking about Mr. Finnerty? A. Mr. Finnerty, as I said, *I only saw him giving a nod of the head in affirmation of this statement.*"

334

The Majority Opinion says that: "Minarcin testified that he did not know the extent of plaintiff's injuries nor that he had his tongue anchored to his cheek." There are none so blind as those that will not see. Finnerty lay in bed, his head buried in bandages, his tongue obviously not free, his breathing heavy, suffering manifestly from extreme shock, and the visible parts of his body gashed with wounds and mutilations, yet Minarcin had the rashness to say that he did not know the extent of the plaintiff's injuries. He knew that Finnerty was so critically injured that Minarcin was kept away from him the first night; he knew that Finnerty was so dangerously stricken that the last rites were administered to him; he knew that Finnerty was in so precarious a state that the doctor ordered him (Minarcin) out of Finnerty's room (in which he had no right to be in the first place)—and yet he tells the Court he did not know the extent of Finnerty's injuries; and this Court accepts as true so patent a fabrication.

The Majority Opinion says further: "Mrs. Burkhardt testified that she heard Minarcin read the statement to the plaintiff who apparently comprehended what was being said to him and after it was read, indicated his approval by nodding in the affirmative." But the Majority does not quote what Mrs. Burkhardt. meant by "comprehending." Here is her testimony: "Q. You are not qualified to state whether or not as a medical matter Mr. Finnerty comprehended what was going on on the morning of the 12th when you say the policeman was there? A. I really don't think anyone could give that statement because *no one knows whether the other person is comprehending what is being said to them.*"

The Majority refers to the fact that Dr. Kahl, "who attended the plaintiff from the time he was brought

to the hospital and thereafter, testified at great length and in minute detail as to plaintiff's injuries and his progress." This is correct. But the Majority then goes on to say that "he [Dr. Kahl] was not called in rebuttal after Minarcin's and Mrs. Burkhardt's testimony as presumably he would have been if he was of the opinion that plaintiff's physical and mental condition prevented him from understanding and responding to the statement taken by Officer Minarcin." Here the Majority makes a strange observation indeed. Since Dr. Kahl had already testified that Finnerty was unconscious for at least five days after he was admitted to the hospital, what would be the object of calling him back to repeat what he had already said? The Majority here overlooks one of the most elementary rules in trial procedure, namely, that a witness may not be called in rebuttal to testify to what he has already testified.

Once a doctor takes the witness stand and categorically states that a patient whom he treated was unconscious at a given time, that specific testimony of itself automatically rebuts the testimony of any other witness to the effect that the patient was conscious. And this is true, whether the contradicting testimony comes before or after the doctor has testified. If the rule were as the Majority portrays it, a plaintiff and defendant could go on ad infinitum affirming and denying, re-affirming and re-denying the same proposition at issue. Henry on Pennsylvania Evidence (Vol. II, page 164, sec. 730, puts it very clearly: "Evidence which is merely cumulative of matters which plaintiff was bound to establish in chief, or *which is in effect a mere repetition of his evidence in chief is not admissible in rebuttal.*"

In the case of *Knights of Pythias v. Leadbeter*, 2 Pa. Superior Ct. 461, 471, the plaintiff in rebuttal pro-

posed to ask a witness the sense in which she understood the language of one Piper. The offer was refused. The Superior Court upheld the rejection, saying: "It is difficult to see then how the rejected offer could have been rebuttal of anything. It was in effect but a repetition of what she had testified to on the present trial as to the meaning which she understood Piper to convey and as she was heard fully upon that subject in her testimony in chief, the plaintiff has no just cause of complaint."

Dr. Kahl's testimony covers 38 printed pages in the record and it left no room for doubt that, according to the doctor, Finnerty was physically incapacitated for speech, or even understanding, at the time that Minarcin "interrogated" him.

The Majority Opinion says that the police officer and nurse were "entirely disinterested witnesses." The nurse was undoubtedly sincere in her testimony, but so far as the officer is concerned, it is not enough merely to say he was disinterested—in the face of what is indelibly written in the record. Of course, no one would say that he had any financial interest in the case, but absence of objective concern does not of itself prove reliability. A "disinterested" witness may, through mistaken zeal, perverse reasoning, unbridled egotism, and callous disregard of the rights of others, do great harm to the cause of impartial justice, and I submit that Minarcin's testimony did just that. This is particularly true because the Trial Judge did not take the trouble in his charge to explain to the jury with what caution they should approach Minarcin's testimony in view of his admitted misstatement as to when he had "questioned" Finnerty, and in view of his many other statements which were refuted by the doctor, the nurse, and hospital records.

The Majority Opinion says that the paper written by Minarcin was admissible because: "The statement was an admission by the plaintiff and admissible as any other unsigned or oral statement by the plaintiff would have been." But the "statement" was not an admission by the plaintiff. The "statement" was a paper written by Minarcin in which he put certain words into Finnerty's mouth and, under the authorities which I have already cited, was clearly not admissible.

An examination of the "statement" itself shows that it carries an addendum not in the nurse's or Minarcin's handwriting, namely: "Witnessed statement of James W. Finnerty 2-11-53 Lee Hospital Johnstown Reg. Nurse at Hospital." This notation was undoubtedly added as an afterthought and some time after the officer had written up the paper because it will be observed that the date is given as 2-11-53, whereas the officer now admits that he did not question Finnerty until Feb. 12, 1953.

In support of its assertion that the "plaintiff's statement" was legally admissible in evidence, the Majority quotes from the decision in the case of *Commonwealth v. Moon,* 389 Pa. 304, 309. But what was said in the *Moon* case in this regard is not only not applicable to the facts in this case, but it was not even applicable to the facts in the *Moon* case. If one will take the trouble of looking up the *Moon* case one will find that the Opinion writer there did not cite any authority for the proposition there stated and here quoted by the Majority. And for a good reason. There is none. The Majority Opinion quotes from the *Moon* decision as follows: "The defendant [Moon] was not harmed by the admission in evidence of the memorandum." Who can say that Moon was not harmed? The jury found him guilty of murder in the first degree and fixed the penalty at death!

James W. Finnerty is entitled to a new trial because of another serious error made by the Trial Judge. The defendant, Darby Transfer and Storage, called to testify in its behalf a man named Mervin Ling. Ling took the stand and related how on the afternoon of the accident, while he was one-half mile away from the locale which later became the scene of the accident, he saw a blue Mercury automobile, with two people in it, travelling in an eastwardly direction on Route 22. After the Mercury car passed by, he walked to his home an eighth of a mile away, ate his supper, and then, being employed by the Highway Department, he went out on a cindering truck. Arriving at what has been referred to as the Rummel house (in whose immediate vicinity the defendant's truck and the plaintiff's car had collided), he saw, he said, a blue Mercury car. With only this kind of a setting for his testimony, he was then permitted to testify that when the blue Mercury car passed him on the highway, one-half mile from the Rummel house, it was travelling at the rate of 50 miles an hour. He did not say that the car which was locked in a death grapple with the defendant's truck was actually the car he had seen on the highway, he did not say that he identified the driver of the blue Mercury on the highway as James W. Finnerty. Yet he was allowed to convey to the jury the inference that it was Finnerty's car he saw on the highway, that it was Finnerty who was driving that car, and that Finnerty continued to drive at 50 miles an hour on a slippery road over a course of one-half mile leading directly to the Rummel house and disaster.

Since, as I have already indicated, the speed of the plaintiff's car became a most vital factor in the case, Ling's testimony was gravely damaging to the plaintiff's cause. It was damaging, it was devastating— and it was illegal. It had no more legally pertinent

part in the trial than testimony as to a car seen on the streets of New York City. Ling testified as follows: "Q. You are not able to tell this jury that the car you saw in this accident when the cindering truck went by was the very same car that had passed you about a half hour before, are you? A. *No, I couldn't.* I didn't see the accident happen."

In cross-examination Ling was asked if he had talked to the defendant's attorney before he testified and he replied in the affirmative. Then the following occurred: "Q. Did he [defendant's attorney] ask you whether the car that had passed you earlier in the evening was the same one which you saw at the accident? A. Yes. Q. What did you tell him? A. I told him it wasn't, *I didn't know.* Q. You told him it wasn't you didn't know? A. *I told him I didn't know, there are other Mercurys the same color.*"

When asked whether "there are lots of blue Mercurys go by on the William Penn Highway [Route 22]" he replied: "That is right." As a matter of fact, after Ling had testified that the car he saw at the scene of the accident was a blue Mercury, he withdrew even that partial identification: "Q. Are you able now to state to the jury what the color of the car was that was in front of the truck when you were ashing up there later? A. No, I couldn't, *I am just guessing now.* I think it was blue." This is indeed speculation carried into such a sea of nebulous incertitude as to amount to evidentiary phantasy. And yet, the Majority is convinced that the blue car which Ling saw on the highway had to be the plaintiff's Mercury. Why is it so sure? Because it says that: "There was no evidence of any car other than the plaintiff's proceeding eastwardly or westwardly in the vicinity prior to the approach of the car of the witness Lyons from the east."

340

The Majority here molds a new standard of proof. If someone says that he saw a car which "looked like John's car" on the highway, that statement will prove it was John's car unless John can prove that there were other cars on the highway which looked like his and one of which could possibly have been mistaken for his car. This is an anomalous doctrine indeed. Up until today identification always depended on the reliability of the identifier. Now, however, according to the Majority, the burden of proof passes to the accused. Thus, if one is accused of murder with expressions such as "he looked like the murderer", or "it might be", or "I guess so", he will be compelled to produce exculpatory evidence, or he is doomed.

But even if we were to accept Ling's shaky, flimsy, vacillating, error-ridden "identification" and assume, arguendo, that the car he saw on the highway was Finnerty's car, on what basis does the Court make such identification relevant? Suppose Finnerty *was* driving a car at fifty miles an hour, *one-half mile* from the point where the accident occurred? What does that prove? Could he not have reduced his speed within that half-mile? The Majority apparently thinks not, for it says: "There is no evidence of any intersecting roads, any traffic or curves which would have caused plaintiff to lower his speed during the half mile in question."

But would that be the only reason for reducing speed? Does the Majority forget the condition of the road in the vicinity of the Rummel home? The Majority itself quotes at length from the testimony showing that the road was slippery, that it was "icy," that the weather was described as "kind of raining sleet." Would that not be sufficient reason for any driver to slow up, regardless of the absence of "traffic" and "curves"?

The Majority says that testimony as to the speed of a car one-half mile away from the climax of the trip is relevant and proper. In support of that proposition it cites five cases. A reading of those cases shows that they are all distinguishable from the case at bar. In *Rooney v. Maczko,* 315 Pa. 113, the witness saw the offending car only 150 to 200 feet away from the locale of the accident. In *Gerhart v. East Coast Coach Co.,* 310 Pa. 535, the speed of the involved vehicle was estimated by two witnesses who saw it only 200 feet from where the accident occurred. In citing *Shellenberger v. Reading,* 303 Pa. 122, the Majority says that a witness saw the defendant's bus pass about 900 feet from the scene of the accident. This is true, but another witness testified to the speed of the bus when it was only 200 feet from the point of the collision. In *Commonwealth v. Pennzoil,* 358 Pa. 221, the witness was 480 feet away. And in *Pierontoni v. Barber,* 384 Pa. 56, we held that evidence as to the speed of a car 900 feet from the point of the accident was admissible, but it is to be noted that the person who gave the estimate not only saw the passing car but followed its movement with his auditory sense and heard the "squeaking of brakes and tires" at the moment of impact. In the case at bar Ling was 2,640 feet from the accident and knew nothing about it until he appeared, in another connection, at the scene of the collision, a half-hour later. He only saw *a* Mercury car for an instant and then did not see it further.

By allowing Ling's testimony as to the speed of *a* Mercury car to stand, the Trial Judge allowed the jury to believe that the Mercury (now charged to be the plaintiff's car) continued unabatedly at the rate of 50 miles an hour for one-half mile up to the moment of the impact, although there is not a scintilla of evidence to support such an inference.

This Court's present attitude on the question under discussion does not coincide with what was said in *Fitzgerald v. Penn Transit Co.*, 353 Pa. 43, 47. In that case, one witness testified that he was about 870 feet from what became the geographic position of the accident when a car passed, which he could not identify. Another witness testified he was 350 feet from the tort locale when he heard a car go by. Neither witness actually saw the collision. This Court, speaking through Justice DREW, said: "The admission of this incompetent and irrelevant testimony was error. The witnesses testified to what they did not see and what they did not know. The testimony was offered to measure the speed of the automobile that passed and identify it as the car involved in the accident, and it was insinuated that the rate of speed continued to the point of the collision. Without having seen the car as it approached and reached the accident it was impossible to make such a deduction. And neither witness would say the car that passed was the car involved in the accident . . . It is conclusive that a new trial must be granted."

In the case of *McCaulif v. Griffith*, 110 Pa. Superior Ct. 522, 531, the Superior Court held that testimony regarding speed of a vehicle 1400 feet from the point of collision was improper: "Appellant's fifth assignment of error is that the trial court erred in admitting testimony as to the speed and operation of defendant's truck 1400 feet from the scene of the accident. One of the questions at issue was the speed of the car at the time of the accident. Testimony as to its speed when *a quarter of a mile away* was irrelevant and should not have been admitted."

I agree with the Majority that "No exact limitation of distance or time can be fixed," and that every case must be decided by its own facts, but I submit that in this case Ling's testimony is such eerie guesswork that

to allow a jury to use it, is like approving a verdict based on the testimony of phantoms.

Guesswork seems to be the motif of this case from beginning to end; and this Court, instead of condemning theories based on mirages and evidence coming from shadows, invests guesswork with the dignity of scientific conclusions. For instance, there was introduced in evidence the deposition of an absent witness, Harold Lang, the passenger in Finnerty's car on the fateful day. In one part of his deposition Lang testified as follows: "Q. What is your best estimate then, sir, of the speed of this car for a mile or so prior to the accident? A. (Pause) *Strictly as a guess* I would say between 40 and 50 miles an hour."

One would think that the Trial Judge would immediately strike such a statement from the record since the witness himself does not vouch for its correctness. However, since the Trial Judge did not strike the statement, it could be assumed that this Court would brand as utterly worthless a statement which is admittedly the result of a sheer guess. But this Court does not brand the testimony as worthless. It is not in the slightest disturbed over so reckless and hazardous an aiming at the supposed target of truth. In fact, the Majority goes out of its way to lavish encomiums upon guessers, surmisers, and conjecturers. It says that a "guess" means "judgment."

If anything is lexicographically certain it is that a guess is merely a conjecture, but the Majority says that: "The word 'guess' does not necessarily mean mere conjecture, but may connote judgment." Webster's New International Dictionary defines a guess as "An opinion formed *without sufficient or decisive evidence or grounds; a conjecture,* a surmise."

The Majority disputes the dictionary and proceeds to show by illustration that guess does not mean guess.

Says the Majority: "If a person is asked to estimate the number of people in a crowd, he may say 'I guess' a certain number, or he may say 'I judge' a certain number. By either term he is expressing an opinion based on observation." It is my belief in the matter that when a person estimates the number of people in a crowd, he can only be guessing because he has no practical way of ascertaining whether he is right or not. Guesses as to size of crowds are notoriously fickle and untrustworthy. When the evangelist, Billy Graham, spoke on Broadway in New York City, September 1, 1957, the police estimated the crowd which heard him to number 75,000. The evangelist himself "judged" the crowd to number 200,000. Life Magazine reporters calculated the number at 60,000.

There was a time when this Court did not have a very high regard for a guess. In 1898, in the case of *Smith v. Railway Company*, 187 Pa. 451, 453, Justice McCollum, speaking for the Supreme Court, said: "A mere guess or conjecture respecting the rate of speed was not sufficient to establish it, and this was all his testimony in regard to it amounted to. The learned judge of the court below, recognizing the insufficiency of the testimony in this respect, instructed the jury that it was a pure guess, and not enough to convict the defendant of running its car at an unlawful speed."

The Majority Opinion expounds at length its theory on the dependability of a guess in the courtroom, but the fact of the matter is that the testimony of Lang went even deeper than the murky waters of guessing. He descended through the depths of conjecture, surmisal, and unawareness, and finally hit the bottom of the sea of unknowledgeableness. He said: "I don't know." And when a man on the witness stand says: "I don't know," he should be dismissed at once. But not in this case. The more Lang kept repeating: "I

don't know," the more he proved, in the opinion of the Trial Court, and apparently this Court as well, that he knew all about the subject on which he was registering continuing ignorance. I will quote from the record: "Q. Do you recall the speed that you were traveling, sir, for, say, two or three miles prior to the happening of the accident. A. *I do not* . . . Q. Do you know if your car was traveling at 50 miles an hour or in excess of 50 miles an hour or below 50 miles an hour? A. Well, immediately prior to the accident probably below. Q. How far below? A. *I don't know* . . . Q. Can you tell us to the best of your recollection what the speed of your car was at that time? A. *I cannot.* I told you before we started this entire questioning that *I didn't know* . . . Q. All I am asking, sir, is to the best of your knowledge what was the speed of your car for one or two miles immediately preceding the happening of this accident? . . . A. *I don't know* . . . Q. Do you know what the speed of Mr. Finnerty's car was at the time you began this sliding or skidding? A. *I don't know* . . . Q. Now, Mr. Lang, I am going to ask you again if you can tell us to the best of your knowledge the approximate speed Mr. Finnerty's car was traveling just before it reached the brow of this hill at which the skid began? A. *I don't know the speed we were going* . . . Q. And you don't know with any degree of accuracy the speed at which you were traveling just before you went into a skid, do you? A. That's right. Q. That is, you do not know, sir. A. *I do not know* . . ."

It is to be noted particularly that immediately after Lang said that "strictly as a guess" he would say the speed was between 40 and 50 miles an hour, he said: "I don't know": "Q. The objection Mr. Ivory stated was because you said: 'I guess.' Now if you hadn't said that why the answer would have been permissible.

The witness: Yes. By Mr. Martell: So I will repeat the question: What was your best estimate, sir, of the speed of Mr. Finnerty's car for approximately one or two miles before the collision? A. *I am sorry but I don't know . . .*"

He testified further: "Q. Your best estimate of the speed of Mr. Finnerty's vehicle, for one or two miles prior to this collision is 35 miles an hour? A. The Witness: (Pause) Well, that nails me down to the specific speed, *I don't know . . .* Q. The speed of the Finnerty vehicle immediately prior to the collision? A. Yes, sir. A. (Pause) *I don't know . . .* Q. What I am asking is for his best recollection of the speed of the Finnerty vehicle immediately prior to the collision. Can you tell us what that is, Mr. Lang? A. (Pause) *I don't know . . .* Q. Can't you tell me that on a direct question when I ask you, sir, when I ask you what the speed was immediately prior to the collision? A. You want an exact speed? Q. No, sir, I don't. A. I mean *I don't know . . .*"

Of course, it is true, as quoted in the Majority Opinion, that on two or three occasions in a deposition of some 65 pages the witness did give an approximation of the speed of Finnerty's car before the accident, but his deposition was so interspersed, interlarded, and intermixed with ever-recurring "I don't knows" as to ruin its probative value. At any rate, what I deplore is the fact that the Majority, by placing its stamp of approval on this type of testimony, invites a transformation of the witness stand into a conjecturing stand, and does not even frown upon a 13th chair being drawn up in the jury room to accommodate a frowsy visitor who has no right in the Halls of Justice anywhere—Mr. Guess himself.

The plaintiff complains in his brief that "The learned Trial Judge did not submit to the jury either plain-

tiff's version of the accident, or the basis of his claim."
I have already indicated wherein I believe the Trial
Judge could have considerably helped the jury to ar-
rive at a fair and just verdict, but wherein he failed
to do so. But even if the charge were as comprehen-
sive as the sky, as purely impartial as the sun, and as
legally precise and correct as an opinion by Chief Jus-
tice GIBSON, it would still not have cured the fatal de-
fects in the trial. Finnerty has not been accorded due
process of law. His constitutional rights were invaded
when the policeman entered his room without author-
ity. His rights were violated when the invading offi-
cer was allowed to testify to a statement which, under
no possible interpretation, could be regarded as a vol-
untary statement by him, assuming that there was any
factual basis for it at all, which, as I have stated a
number of times, the record refutes.

Finnerty's fate in the courtroom was not decided by
evidence but by guesses and surmises masquerading as
evidence. Finnerty was not accorded a fair trial, and
I fear that, because of the decision of this Court on the
points discussed, other Finnertys may face the same
melancholy treatment which this case so dismally re-
cords.