**Howard JAMISON, Administrator of the Estate of Lawrence F. Tomlinson, Deceased, Plaintiff,**

**v.**

**John Thomas KLINE, Defendant.**

**Civ. A. No. 66–1312.**

United States District Court, W. D. Pennsylvania.

Nov. 20, 1970.

William S. Schweers, Harrington, Feeney & Schweers, Pittsburgh, Pa., for plaintiff.

Donald W. Bebenek, Meyer, Darragh, Buckler, Bebenek & Eck, Pittsburgh, Pa., for defendant.

## OPINION

WEIS, District Judge.

The dangers inherent in the now thoroughly discredited three-lane highway design are tragically illustrated in this case involving a fatal accident which occurred on U. S. Route 22 in Westmoreland County, Pennsylvania. The two car collision occurred on December 3, 1965 at about 7:30 P.M., when it was dark, clear, and dry. The plaintiff's decedent, accompanied by two passengers, had been proceeding in a westerly direction and the defendant, who was traveling alone, had been driving in an easterly direction.

At the time of the impact, the defendant's automobile was occupying the center lane and, while the testimony did not clearly establish the location of the plaintiff's car, seemingly most of it was in its proper right-hand or the north lane but with some portion of the vehicle angled into the center lane. The plaintiff's theory was that the decedent's automobile had moved partially into the center lane and was attempting to get back completely into its right hand lane but was unable to do so because there was not enough time. The defendant contended that he had occupied the center lane before the decedent pulled into that passing area and this violated Kline's right of way.

The jury returned a verdict in favor of the defendant which could be justified by finding that the defendant was not negligent or, as appears more probable to the court, that both drivers were at fault to some degree and that their joint negligence brought about the tragedy.

Plaintiff urges two errors in admission and exclusion of evidence as a basis for his motion for a new trial.

■ About three miles west of the accident scene, a state trooper noticed the defendant's automobile proceeding past him at what he said was a "faster rate of speed than the other vehicles on the road", and that he then proceeded to go east "just to see if I would be able to pick a * * * catch the speeding vehicle, which I thought was speeding, and possibly clock it for speeding." (Tr. p. 9) The policeman did not again see the defendant's automobile until after the accident had occurred.

An offer of the plaintiff to elicit from the state policeman the speed at which the defendant's automobile was proceeding when first seen was refused on the ground that speed at a point three miles from the point of collision was too remote absent evidence to show that the vehicle continued at the same pace until the point of collision.

In Finnerty v. Darby, 391 Pa. 300, 138 A.2d 117 (1958) testimony of a witness as to the speed of a vehicle one-half mile before the point of collision was held admissible but there was also evidence that the vehicle maintained about the same rate from that point to where it became involved in the accident. Significantly, however, in its opinion the Pennsylvania court said:

"If the only evidence of plaintiff's speed was that of the witness Ling that the plaintiff's car when it passed him was traveling 50 miles an hour, appellant's objection to the admissibility of such evidence might be considered well taken."

The rule, however, seems to be as the court indicated:

"Whether the evidence of speed is too remote in time and distance depends upon the facts of each case, and to an extent where it is the only evidence or is corroborative of other admissible evidence of speed."

In the state of the record of this case, it does not appear to have been error to exclude the proffered evidence.

■ A more serious contention, however, is raised by the plaintiff with respect to other evidence produced on defendant's cross-examination of the same state policeman.

On direct examination, the trooper testified that the defendant's automobile left straight skid marks of 117 feet com-

pletely within the center or passing lane up to the point of collision. On cross-examination, without any preliminary qualifying inquiry, the following questions and answers ensued: (Tr. p. 29)

"Q. Now, you said there was 117 feet of skid marks. Are you familiar with the skid charts produced by the Northwestern University Traffic Institute?

"A. Yes I am.

"Q. All right. And from your knowledge, 117 feet of skid marks on pavement of this type would equal what speed?

"A. 47 miles an hour.

"Q. And these were solidly in the center lane of traffic?

"A. That is correct."

This concluded the cross-examination and counsel for the plaintiff at side bar then moved to strike this testimony. The motion was refused but counsel for the plaintiff was given leave to examine the officer on how he reached his conclusions, the basis of his calculations and any other matter bearing on the point.

Counsel for the plaintiff then proceeded to interrogate the trooper, drawing out an admission that the measurement of skid marks and the equivalent speed applies in a situation where application of brakes causes the vehicle to come to a complete stop. Counsel then continued questioning the trooper as follows: (Tr. pp. 33, 34)

"Q. Now, there is no evidence, as a matter of fact, from the damage to the cars—there is no evidence that the Kline car was at a stop when the impact occurred, is there?

"A. No there isn't.

"Q. So that there was still, obviously, some forward motion of the Kline car.

"A. That is correct.

"Q. So that then your testimony of 47 miles per hour with regard to the length of this particular skid mark is somewhat misleading, is it not?

"A. I did testify that the skid marks started from a point 117 feet from the point of impact. I—

"Q. Right, but you are making an equivalent, that that length of skid mark is equal to so many miles per hour. That is somewhat misleading, is it not?

"A. Well, there had to be more speed because he was still involved in the accident.

"Q. Right. Right, that is exactly the point, that there is no telling how far the skid marks would have extended had the collision not occurred, isn't that a fact?

"A. That is correct."

The speed limit in the accident area was 50 miles per hour. The photographs of the automobiles which had been admitted into evidence displayed indications of a tremendous impact. It was obvious from these photographs that defendant's automobile was far from being stopped at the point of collision and must have been proceeding at a speed in excess of the 50 mile limit. Significantly too, there was no effort to renew the motion to strike at the conclusion of the trooper's testimony.

Technically, perhaps it would have been better had the court granted the plaintiff's motion to strike the testimony rather than refusing it and allowing the plaintiff to cross-examine on this point. However, as every experienced trial lawyer and judge is aware, an instruction to a jury to disregard some evidence which they have heard very clearly is always subject to some question of efficacy. See Bruton v. United States, 391 U.S. 123, 132, 88 S.Ct. 1620, 20 L.Ed.2d 476. Here it was felt that justice would be better served by allowing plaintiff to examine the trooper in order to develop the basis of his answer of equivalent speed and thus demonstrate clearly that it was not applicable to the particular situation. A simple instruction to disregard the testimony would not have been as desirable nor as convincing. This is one

of those areas where the trial judge must be given latitude to determine the best method to be used in the search for truth.

It is true that the plaintiff felt that speed on the part of the defendant was one of the essential parts of his case. However, the testimony of the trooper referred to earlier that he was following the defendant's car with a view toward clocking him for a violation of speed limit certainly was known to the jury. In addition, plaintiff's counsel was able to bring out on cross-examination of the defendant that he had testified in a deposition that his speed at the moment of impact was approximately 40 to 45 miles per hour. This admission, coupled with the length of the skid marks, the testimony of the state trooper and the violence of the collision, could not but have convinced the jury of excessive speed on the part of the defendant.

The plaintiff was not harmed by the refusal to give the instruction to the jury to disregard the trooper's testimony but rather was able to capitalize on the opportunity to turn the evidence of skid marks to his advantage, developing evidence that he could not otherwise have presented to the jury.

Not every erroneous ruling on evidence (even if it be conceded that the trial court did err and no such concession is made) would be the basis for a new trial. As the court said in United States v. American Radiator and Standard Sanitary Corp., et al., 433 F.2d 174 (3d Cir. 1970):

"Whether the errors be viewed in isolation or cumulatively we are completely satisfied that they did not deprive appellants of a fair trial or operate to their substantial prejudice. On the contrary, we are satisfied from our examination of the record in its totality that the appellants received a fair trial and that their conviction was entirely warranted from the evidence."

A review of all the evidence in this case makes it clear that there was ample evidence of speed on the part of the defendant. The weakness of the plaintiff's case was not in this facet but rather in convincing the jury that the decedent took adequate precautions before entering into the passing lane. Excessive speed on the part of the defendant would not absolve the plaintiff of his duty of care but in fact would have required greater caution before proceeding into the center lane in the face of rapidly approaching danger.

The court is convinced that the case was properly decided by the jury on the merits and that there is no basis for the grant of a new trial.

Order accordingly.