# Morningstar v. Hoban

C.P. of Allegheny County, no. GD 99-13670.

*John P. Gismondi,* for plaintiff.
*Thomas L. VanKirk, Peter S. Russ* and *Gregory J. Krock,* for defendant.

BAER, *J.,* January 17, 2002—On Saturday morning, May 8, 1999, John Morningstar left his home in Cecil Township, Washington, Pennsylvania, to go to work at about 7:45 a.m. At around the same time, defendant, Nicholas Hoban was driving toward Morningstar from the opposite direction. At 7:58 a.m., defendant lost control of his vehicle, crossed into Morningstar's lane and hit the front of Morningstar's car. Morningstar was transported by a life-flight helicopter to a local hospital where he died from his injuries shortly after the accident.

The district attorney of Washington County charged defendant with homicide by vehicle as well as driving recklessly, driving at an unsafe speed and driving on the wrong side of the highway. After a first trial ended with

a deadlocked jury, Washington County decided to try the case again. During the second trial, defendant pleaded guilty to all of the charges in return for an agreed upon sentence that did not include incarceration.

Morningstar's widow, M. Aileen Morningstar, plaintiff, brought a civil action against defendant on behalf of herself, her and Morningstar's two minor children, Charissa, a college freshman, and John, a high school junior, at the time of the trial, and Morningstar's estate. She sought both compensatory and punitive damages.

While defendant's insurance carrier provided a full defense against all claims, it correctly asserted that it was only responsible for compensatory damages. It was forced to admit liability for such damages because of defendant's guilty plea. To protect their mutual interests, the carrier and plaintiff entered into an agreement that if the jury returned a verdict for compensatory damages of less than $2,500,000, the insurance company would, nevertheless, pay that amount. Conversely, if the jury returned a verdict in excess of $5,500,000, plaintiff would accept that amount. If the jury's verdict was between these numbers, both would be bound by it. The carrier agreed to pay delay damages on the jury's award. Plaintiff and defendant did not reach any agreement regarding plaintiff's claim for punitive damages.

The jury awarded compensatory damages of $4 million and punitive damages of $3 million. Pursuant to its agreement, defendant's insurance company paid plaintiff the $4 million plus delay damages. Defendant retained new counsel who filed post-trial motions on his behalf attacking only the punitive damage award. Plain-

tiff also filed post-trial motions to preserve issues in the event a new trial was granted. While we were completing this opinion, plaintiff entered judgment. This forced defendant to take an appeal. Accordingly, rather than writing to explain our reasons for denying post-trial relief, we submit this opinion to explain our various trial rulings challenged by defendant through his post-trial motions.

A full recitation of the facts is necessary before the issues can be discussed.[1] Morningstar was employed as the parts manager for Bowser Pontiac, an Allegheny County new car dealer. This position required that he work one Saturday morning each month. Among Morningstar's hobbies was restoring classic cars. On the Saturday morning he died, Morningstar was on his way to work driving a 1971 Cadillac he had fully restored.

When he left his home in Cecil Township, Washington County at about 7:45 a.m., a fine rain either was or had been falling and the roadways were wet. Morningstar's route took him eastward on Route 50 from Cecil Township toward Bridgeville Borough in Allegheny County. Route 50 is a two-lane road through Cecil Township that, as it proceeds eastward toward Bridgeville, passes Spinosa's Dairy Bar, the scene of the accident, on the right. Very shortly thereafter, Route 50 is intersected by Wabash Avenue, a steep downhill road

---

1. It should be stressed that defendant's position regarding his driving during the moments preceding the accident, the cause of the accident and his statements and observable demeanor after the accident are diametrically different than the version provided by witnesses for plaintiff. Defendant's position will be set forth toward the conclusion of this statement of the facts.

on the opposite side of the street from Spinosa's. There is a rise on the curb side of Route 50 where it meets Wabash that was referred to throughout the trial as "the hump." The speed limit on this two-lane portion of Route 50 is 35 miles per hour. As one continues toward Bridgeville, almost immediately past the hump, Route 50 widens into four lanes and the speed limit increases to 55 miles per hour. From Spinosa's to the hump and on to the juncture of the two-lane and four-lane portions of Route 50 is no more than a couple hundred yards.

Defendant owns 100 percent of the stock and is the president and operator of the Pennsylvania Culinary Institute, a downtown Pittsburgh trade school for individuals entering the food service industry. The culinary school had purchased the Sawyer School, another trade Pittsburgh school, shortly before Morningstar's death, and culinary school personnel had scheduled a meeting at the Sheraton Hotel at Station Square across the Monongahela River from downtown Pittsburgh with the employees of the Sawyer School for between 8:30 and 9 a.m. on the Saturday morning of the accident.

It was uncontested that defendant was to attend that meeting and speak with the Sawyer School employees, although the time he was to arrive at the meeting was subject to much dispute. It was plaintiff's contention that defendant intended to arrive early, and therefore was in a hurry and driving with reckless indifference when he hit Morningstar. Defendant contended that he was not expected at the meeting until 11:30 a.m., and therefore had no reason to be driving inappropriately when the accident occurred.

Although defendant had only been to his pastor's residence once several years before the accident, he testified that he was traveling from his Allegheny County home to pay the pastor an unannounced visit at his home in Cecil Township when the accident occurred. Accordingly, shortly before the accident, defendant had driven his Lexus LX470, a sport utility vehicle (SUV), onto the divided four-lane portion of Route 50 and headed westward toward the two-lane portion of this road in Cecil Township. During the time it took defendant to drive to the scene of the accident, five individuals observed him. All were strangers to this case, and all testified as to their observations of defendant's driving.

Jeffrey Nobers was a 43-year-old account supervisor for a Pittsburgh advertising agency. He had been driving since he was 16 on all types of highways and at various speeds, and frequently traveled the road where the accident took place. According to Nobers, he was driving past the entrance ramp defendant used to access Route 50, and observed him coming up the ramp. Nobers moved his vehicle from the right lane to the left lane to allow defendant unobstructed access to the road.

As soon as defendant was on Route 50, he immediately passed Nobers on the right and approached a Chevrolet Cavalier that was in front of Nobers and defendant in the right lane. Defendant applied his brakes, and Nobers, still in the left lane, passed both defendant and the Cavalier. Nobers specifically looked at defendant because Nobers "didn't appreciate the way he [defendant] was driving." Nobers positively identified defendant at trial as the driver of the SUV.

After Nobers passed defendant and the Cavalier, Nobers looked into his rear view mirror in anticipation of moving back into the right lane and saw defendant "jump" into the left lane behind him and accelerate. Then, as Nobers began to move to his right, defendant "jumped" back into the right lane and passed Nobers on the right side at an estimated speed of 65 to 70 miles per hour.

Nobers lost sight of defendant for the short time it took to travel from where all of this occurred to where Route 50 narrows from four lanes to two, and the speed limit changes from 55 miles per hour to 35 miles per hour, just before the scene of the accident. At that point, Nobers saw defendant crest a hill and pass another car at a speed Nobers estimated at between 80 and 90 miles an hour. Forty-five seconds later Nobers arrived at the accident scene and saw what was left of Morningstar's Cadillac and defendant's Lexus.

Another witness, Robert Lambert, was 37 at the time of trial, had been driving since he was 16 on rural as well as interstate roads, and had lived and worked in the vicinity of the accident for years. On the morning of the accident, Lambert was driving on the two-lane portion of Route 50 in the same direction and slightly ahead of Morningstar. Defendant was therefore approaching from the opposite direction. Lambert testified that he saw defendant come from the four-lane section of Route 50 onto the two-lane portion of the roadway going faster than 60 miles per hour, out of control and partially across the center line.

George Yagulli was 49 at the time of trial, and had been driving since he was 16. He was a supervisor for an

electrical construction company and drove a great deal as part of his employment. He had experience driving on rural as well as interstate roads, and was familiar with the area of the accident. Yagulli was traveling in the same direction as Morningstar and Lambert and saw defendant 200 to 300 yards in front of him, and coming toward him. Yagulli estimated defendant's speed on the four-lane portion of Route 50 at 70 to 100 miles per hour. Defendant's driving so alarmed Yagulli that he pulled his car over to the side of the road and stopped.

Yagulli watched from this vantage point as defendant entered the two-lane portion of Route 50. Yagulli testified that as defendant passed the hump "it seemed like the front wheels [of defendant's SUV] were off the ground, or, if not, the shocks were extended as far as it [sic] could." Yagulli then saw defendant swerve, lose control and hit Morningstar. Yagulli testified that he never saw any other car force defendant onto the right berm of Route 50.

Jeffrey White worked with Yagulli and was following him on the morning of the accident. White was 44 at the time he testified. He had been living in the area of the accident his whole life, and driving there since he was 16. Because of his work, White drove on both rural and interstate roads, and had observed vehicles on different roads, at different speeds, from different vantage points and driving under different conditions. Like Morningstar, Lambert and Yagulli, White was traveling toward Bridgeville and defendant when he saw defendant and pulled off the road in Spinosa's parking lot to avoid being hit and watched the accident unfold from that vantage point. White observed defendant from about 150

yards come across the hump spinning sideways at about 75 miles per hour and colliding with Morningstar.

Randal Gossic is a commercial airline pilot. He testified that he was 40, and had been driving since he was 16. During his years as a driver, Gossic had the opportunity to observe others driving on both rural and interstate roads and at various rates of speed. He had a lifetime of familiarity of the roads around the scene of the accident, and lived one-half mile from Spinosa's.

Gossic came out of Spinosa's with a cup of coffee and a newspaper and got into his car, which was facing toward Bridgeville. He looked up and saw defendant's SUV come over the hump at 75 to 95 miles per hour and out of control. Gossic saw Morningstar go past him and estimated that Morningstar was about 80 percent off the road when defendant crossed the center line, started to roll over and hit Morningstar, pushing his 1971 Cadillac back and through the front wall of Spinosa's. Morningstar's car hit the dairy bar with sufficient force to crumble the front wall and move a counter inside the building. Hoban's airbags deployed and his SUV rolled over an undetermined number of times and came to rest on its side on the opposite berm of the road from Spinosa's.

Sergeant Openbrier of the Cecil Township Police Department received the accident call at 7:58 a.m. and arrived at the scene at 8:03 a.m. Very shortly thereafter, Patti Berty, a paramedic, and Edward Galcic, an emergency medical technician, arrived at the scene. Berty went to check on defendant who was still inside his overturned vehicle. Berty inquired as to his condition, and defen-

dant responded saying he was all right. Berty then asked him his name, and defendant responded by asking repeatedly, "How long is this going to take? I have a meeting. I don't have time for this."

Meanwhile, Galcic began to treat Morningstar, whose car was trapped in Spinosa's front door and whose legs were trapped under the dashboard of the car. Galcic recognized the severity of Morningstar's injuries, and called for a life-flight helicopter. The fire department extracted Morningstar alive but unconscious, and flew him to UPMC-Presbyterian Hospital.

Someone from the hospital called Mrs. Morningstar at her home, told her about the accident and advised her that she should have a neighbor bring her to the hospital. In accordance with these directions, Mrs. Morningstar had someone drive her and the two children to the hospital. When they arrived at about 10:30 a.m., a member of the hospital's staff met them and told them that Morningstar had died from his injuries.

Back at the scene, defendant had been removed from his vehicle by the fire department, treated for minor injuries and was interviewed several times by Sergeant Openbrier. Defendant denied that he was speeding. He said he hit a wet spot on the roadway and slid. He never mentioned being forced to the side of the road by the appearance of another car.

Openbrier told defendant that he would have to go to the hospital and be checked out. Defendant responded that he had a very important meeting to attend and did not want to go to the hospital. He never mentioned his pastor, or the visit to his home. Eventually, defendant

acquiesced to Openbrier's demand that he be taken to the hospital, and was transported there by ambulance.

Openbrier testified he attempted to interview defendant again at the hospital, but defendant would not cooperate with him because he was busy making telephone calls from his gurney discussing the ongoing meeting between his employees and those of the Sawyer School. Openbrier stated that he took notes of defendant's telephone conversations because defendant's conduct was not typical of the conduct Openbrier had observed from others involved in serious accidents. Openbrier heard defendant tell someone named Carl that he would be late for the meeting, and that Carl should buy the participants lunch to keep them there. Openbrier described defendant's demeanor in the hospital as "very cavalier" and "anti-typical" of what he generally observed from a participant in a bad accident. Defendant eventually left the hospital and attended his meeting at the Sheraton.

As mentioned in footnote 1, defendant denied that he was speeding and the descriptions of his driving given by the various witnesses. He also denied ever making the post-accident comments or exhibiting the demeanor attributed to him. In support of his position, he called Christine Tullius M.D., the emergency room physician who treated him at the hospital. Dr. Tullius testified that defendant asked about Morningstar's condition, and asked her to pray for Morningstar with him.

Defendant also called his pastor, David Morgan, who testified that he found out about the accident and Morningstar's death through a different source and went to defendant's home, where he was waiting when defen-

dant returned from the meeting at the Sheraton. The pastor took defendant into a private room and informed him of Morningstar's death. The pastor testified that defendant reacted with shock and disbelief, and asked the pastor to pray with him for the Morningstar family.

Defendant testified at length. He denied speeding, but agreed that he was driving too fast for conditions.[2] Defendant's testimony was that as he approached the scene of the accident, he saw a car coming from the opposite direction (which is the direction from which Morningstar, Yagulli and White were coming, and the direction Gossic was looking at the time of the accident) in his lane and coming toward him. This caused defendant to move to his right where he hit the gravel berm of the road and saw a telephone pole. To avoid the pole, defendant swerved to the left and then to the right. When he swerved to the right the second time, he was heading into the hillside and so again swerved to the left. It was on this "third correction to the left" that he "plowed" into Morningstar's car.

Defendant testified that he asked about Morningstar while he was still trapped in his car, and never mentioned to anyone that he was late for a meeting. He also testified that he was never callous or cavalier, and was always concerned for Morningstar's well-being.

The district attorney of Washington County charged defendant with homicide by vehicle, driving on the wrong side of the roadway, reckless driving, and driving at an

_____

2. Although it was unsaid during the trial, defendant had no choice but to testify in this fashion because of the guilty plea to the charge of driving too fast for conditions in his prior criminal proceeding.

unsafe speed. The case went to trial, but resulted in a hung jury. Washington County decided to retry the case. During the second trial, the parties entered into an agreement that permitted defendant to plead guilty to all of the charges in return for a sentence that did not include time in jail.

Plaintiff filed a civil action on behalf of herself, her two children and her deceased husband's estate seeking both compensatory and punitive damages. Plaintiff asserted the doctrine of collateral estoppel, arguing that defendant's guilty plea precluded him from denying liability for compensatory damages in the civil case, and defendant conceded the point. Thus, the case went to trial to determine the amount of compensatory damages, whether defendant was liable for punitive damages, and, if so, the amount of punitive damages.

Defendant's insurance company had only contracted to, and, in accordance with Pennsylvania law, was only permitted to provide insurance covering compensatory damages.[3] The company, however, provided defendant with a full defense against the punitive damage claim.

Defendant's carrier was concerned about the potential size of the verdict. Plaintiff was also concerned that she receive adequate compensation to provide for her family after the loss of her husband. To protect their individual interests, the insurance company and plaintiff entered into a "high/low agreement." The carrier agreed

---

3. See *Creed v. Allstate Insurance Co.*, 365 Pa. Super. 136, 529 A.2d 10 (1987); *Esmond v. Liscio,* 209 Pa. Super. 200, 224 A.2d 793 (1966). Defendant had "umbrella coverage" and therefore policy limits were $6,000,000.

that if the jury returned a verdict for compensatory damages of less than $2,500,000, it would nevertheless pay that amount, and plaintiff agreed that if the jury returned a verdict for compensatory damages in excess of $5,500,000, she would nevertheless accept that amount. If the jury's verdict was between these figures both could accept it. The carrier agreed to pay delay damages on the jury's award. Implicit in this agreement was that there would be no appeal. The carrier continued to provide defendant with a defense regarding punitive damages, but no agreement was reached concerning that part of the case.

After a five-day trial, the jury returned a verdict of $4 million in compensatory damages and $3 million in punitive damages. The compensatory damage award was molded to include $208,547 in delay damages and was paid. Defendant retained new counsel and filed post-trial motions contending that we erred in various respects, and that therefore either the punitive damage award should be vacated or a new trial or remittitur should be granted. Plaintiff filed post-trial motions solely to protect the record. While we were completing work on this opinion, plaintiff entered judgment. Defendant then appealed. Accordingly, while we were intending to deny post-trial motions through an order supported by this opinion, we file it in accordance with our obligation to explain the reasoning for our decisions during trial in accordance with Pa.R.A.P. 1925.

Against this backdrop, we turn to defendant's various assignments of error. The first four contend that we committed errors of law and abused our discretion while admitting and refusing to admit proffered evidence. We will

review these assertions seriatum. First, defendant contends that we were wrong in admitting into evidence the estimates of defendant's speed from the five eyewitnesses who observed him at various times as he traveled from several miles away to the accident site.

The Pennsylvania Supreme Court first addressed this issue in *Finnerty v. Darby*, 391 Pa. 300, 138 A.2d 117 (1958). In this case, the defendant contended that the observations of a pedestrian as to the speed of the plaintiff's vehicle approximately one-quarter to one-half mile before the accident were not relevant to the speed of the vehicle at the point of the impact. The trial court had permitted the testimony and the Pennsylvania Supreme Court affirmed stating:

"This court has frequently ruled that testimony as to the speed or operation of an automobile at a . . . short time before the collision is admissible and relevant to the issue of the speed of the vehicle at the time of the accident. Such evidence is admissible, its weight and credibility being for the jury . . . . Whether the evidence of speed is too remote in time and distance depends upon the facts in each case and to an extent whether it is the only evidence or is corroborative of other admissible evidence of speed." *Id.*, 391 Pa. at 315-16, 138 A.2d at 124. The last sentence of the above quote highlights the need to examine every case on its own facts in deciding whether to admit or exclude a layperson's testimony regarding speed. This point was made again in *Radogna v. Hester*, 255 Pa. Super. 517, 521, 388 A.2d 1087, 1089 (1978), where the Superior Court opined that the admissibility of testimony estimating speed "is not strictly connected with evidence of the distance traversed by the

vehicle in question but, rather, depends upon the existence of an overall opportunity for adequate observation, in addition to the witness' prior experience with moving vehicles." (footnote omitted)

Thus, there are no rigid standards for the admission or exclusion of estimates of speed. Trial courts must consider the witness' experience in estimating the speed of vehicles, the witness' opportunity for observation of the vehicle in question and the nexus between when the vehicle in question was observed and the time of the accident.

Nobers had been driving for 27 years on all types of highways and at various speeds. He had personal knowledge of Route 50 from the place he first saw defendant through the point of the accident. Nobers observed defendant enter Route 50. Nobers then passed defendant, watched as defendant got behind him in the road's left lane, then went back into the right lane and passed on the right. He estimated defendant's speed at that juncture at 65 to 70 miles per hour.

Nobers lost sight of defendant for a few minutes, and then saw him again within seconds of the accident. During the second sighting, Nobers watched defendant pass another car at an estimated speed of between 80 and 90 miles an hour just before the point where Route 50 narrows from four lanes to two lanes. This was within 200 yards and, therefore, a few seconds of the accident site.

Nobers saw defendant within four or five miles of the accident site, which were traveled within a few minutes. He saw defendant pass him while he was going approximately the speed limit of 55 miles per hour, and then go

fast enough to be out of his sight for part of these few minutes. Nobers continued on the highway at the speed limit, but did not catch up to defendant. He did, however, see him again just before the accident, and again had the opportunity to estimate his speed. Nobers observed defendant's continuing and consistent pattern of driving through these sightings. This provided Nobers with a more than adequate opportunity for observation. Thus, under these facts, Nobers' testimony was admissible.

Lambert had been driving 21 years at the time of the accident, and had experience on both rural and interstate roads. He lived and worked in the vicinity of the accident and also knew Route 50 well. Lambert saw defendant come from the four-lane section of Route 50 onto the two-lane portion, and estimated his speed to be 60 miles an hour within several seconds of the accident. There is no evidence from anyone, including defendant, that he slowed after that point. Lambert clearly had the experience, the knowledge of this road system and the opportunity for full observation that are the requisite requirements for the admission of his testimony.

Yagulli had been driving 33 years at the time of the accident, and also had experience on interstate and rural roads. Like Lambert, Yagulli was familiar with Route 50. Yagulli testified that he saw defendant 200 to 300 yards before the accident, and watched defendant come toward him from the four-lane portion of Route 50 and onto the two-lane portion of the road. Defendant's driving so alarmed Yagulli that he pulled his car over to the side of the road and stopped. Yagulli saw defendant arrive at the hump, lose control of his car and hit Morning-

star. Yagulli had the opportunity to see defendant from the side and the front, and watched him from when he left the four-lane portion of the road to the point of impact. There is no question that Yagulli, like Nobers and Lambert, had both the basis and the opportunity for observation necessary to offer an opinion regarding defendant's speed.

White had been driving for 28 years at the time of the accident, and lived in the area of the accident his entire life. Because of his work, White drove on both rural and interstate roads, and had observed vehicles on these different roads at different speeds and from different vantage points. White worked with Yagulli and was following him when the accident occurred. Like Yagulli, White was driving his car when he first saw defendant, then pulled over and stopped for his own safety while continuously observing the defendant. White watched defendant for 150 yards as he came across the hump, sped out of control and hit Morningstar. As with the other witnesses, White had the experience and opportunity for observation necessary to render his testimony admissible.

Finally, Gossic, the commercial airline pilot, had been driving 24 years on both rural and interstate roads at various speeds at the time of the accident. He also was very familiar with Route 50 around the scene of the accident, as he lived one-half mile from Spinosa's. Gossic was sitting in his car at Spinosa's, the scene of the accident, when he first saw defendant. He watched him come over the hump at a speed Gossic estimated at 75 to 95 miles an hour, and hit Morningstar within 20 feet of Gossic's vantage point.

Defendant argued that Gossic's observation was of defendant coming straight at Gossic, and that it is particularly difficult to estimate speed from that point of view. Defendant's premise is wrong. Gossic first saw defendant at an angle to Gossic's right as defendant came over the hump, and then saw him swerve on a direct line toward Morningstar. Even if defendant's premise was correct, the question of angle of view would go toward the weight of the evidence, rather than its admissibility. As with the other eyewitnesses, after the most careful review of the record, we have no hesitancy in concluding that Gossic's testimony estimating the speed of defendant's vehicle was admissible.

In concluding our discussion, we remember that the cited precedent instructed us to consider whether a witness' testimony was corroborated by other admissible evidence. Here, we note that plaintiff called five individuals who, with the exception of Yagulli and White, did not know each other, Morningstar or defendant. Among all of them, they had the opportunity to observe defendant's vehicle from when it entered Route 50, to when it reached the narrowing of the road from four lanes to two lanes, to the hump and then to the point of the accident. Their observations were from different vantage points, at different intervals, from different distances and for different lengths of time. Notwithstanding all of this, their testimonies were remarkably consistent and corroborative of each other. While issues of credibility and ultimate believability are solely within the province of the jury, there is no question that their testimonies were sufficiently reliable and probative to the issues at hand to be admissible.

Defendant's second averment of error concerns our admitting into evidence the testimony of Sergeant Terry Openbrier of the Cecil Township Police and paramedic Patti Berty regarding defendant's statements and observable demeanor immediately following the accident. Defendant contends that this evidence was not relevant and that any probative value was outweighed by its prejudicial value.

Punitive damages are awarded only if an actor's conduct is malicious, wanton, willful, oppressive or exhibits a reckless indifference to the rights of others. *Martin v. Johns-Manville Corp.,* 508 Pa. 154, 171-72, 494 A.2d 1088, 1097 (1985) (plurality opinion per Justice Hutchison with one justice concurring and four justices concurring in the result) quoted and approved in applicable part, *SHV Coal Inc. v. Continental Grain Co.,* 526 Pa. 489, 494, 587 A.2d 702, 704 (1991). In *Martin v. Johns-Manville,* the Supreme Court set forth some broad standards applicable to punitive damages stating:

"As a general guide in this area Pennsylvania recognizes the principles set forth in section 908(2) of the Restatement (Second) of Torts:

"(2) Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his *reckless indifference* to the rights of others. In assessing punitive damages, the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause and the wealth of the defendant.

"See *Chambers v. Montgomery,* 411 Pa. 339, 344, 192 A.2d 355, 358 (1963). Thus, in deciding whether puni-

tive damages should be assessed, the nature of the tort-feasor's act itself; *together with his motive,* the relationship between the parties and all other attendant circumstances should be taken into account." (emphasis added) (citations omitted)

As will be discussed fully below, for there to be "reckless indifference," a jury must find that an actor knew or had reason to know of facts creating a high degree of risk to another, and deliberately proceeded to act or fail to act in conscious disregard or indifference to that risk. *Martin v. Johns-Manville Corp., supra* at 171, 388 A.2d at 1097; *SHV Coal Inc. v. Continental Grain Co., supra* at 494, 587 A.2d at 704.

The only liability issue during this trial was whether defendant owed plaintiff punitive damages. Plaintiff's whole theory was that defendant's motive for driving with reckless indifference was his obsession with arriving at his business meeting at the Sheraton as soon as possible. Defendant absolutely denied and contested these averments. He testified that while he was going too fast for the rainy conditions, his speed was at the speed limit of 35 miles an hour.[4] Even under cross-examination, his position was that he was going no more than 40 miles an hour, and constantly decreasing his speed when he lost control of his car. He testified also that he was not due at his meeting until 11:30 a.m., and therefore had no reason to be driving fast or recklessly or to make the comments attributed to him by Openbrier and Berty.

---

4. As mentioned in footnote 2, defendant was forced to acknowledge that he was traveling too fast for conditions because he had pleaded guilty to that charge as part of his plea agreement in criminal court.

Plaintiff's brief aptly cites the case of *Ehmke v. Hicks,* 715 P.2d 306 (Ariz. App. 1985), regarding this issue. In that case, the plaintiff and his two minor children brought an action seeking damages for injuries sustained in a two-vehicle head-on collision. The plaintiff alleged that the defendant caused the accident and then exited his vehicle and confronted the plaintiff using "threatening, argumentative and abusive language." The plaintiff alleged further that the defendant then went back to his vehicle, got a rifle for purposes of "settling the matter," and when the defendant saw the plaintiff's young daughter, said to her, "Come here, little girl, and let me put your head back on."

As in the case before us, the plaintiff sought punitive damages. The defendant admitted gross negligence and argued that in light of that admission, his post-accident statements and conduct were not admissible. The plaintiff rejoined that the statements and conduct were admissible to show the defendant's state of mind during, as well as after the accident, and as such, were related to the issue of punitive damages. The trial court granted a motion in limine precluding the admission of the defendant's statements and conduct, and the Arizona Court of Appeals reversed. It might well have been opining in this case when it observed:

"We find that the motion in limine precluded post-collision evidence which the fact-finder may have found to bear on Hicks' attitude at the time of driving and the question of punitive damages. This evidence of the flavor of his attitude should not have been kept from the jury." *Id.,* 715 P.2d at 308. (citation omitted)

In support of its argument that the evidence discussed herein was not relevant, the defendant cites *Thomas v. American Cystoscope Makers,* 414 F. Supp. 225 (E.D. Pa. 1976), and *Whyte v. Robinson,* 421 Pa. Super. 33, 617 A.2d 380 (1992). Both are wholly distinguishable. In *Thomas,* the plaintiff doctor suffered an eye injury while using a medical instrument fabricated by a manufacturer. The plaintiff sought both compensatory and punitive damages, and introduced evidence of the manufacturer's conduct vis-à-vis the general public after the date of the incident in support of his punitive damage claim. The jury awarded the punitive damages, but the trial court reviewing the award reversed that decision and granted judgment n.o.v.

Defendant in our case argues that *Thomas* stands for the proposition that evidence of what occurred prior to the accident is admissible, but no post-accident evidence, regardless of its nature, is admissible. *Thomas* does not say that. The distinction drawn in *Thomas* is between evidence having a connection with the injured plaintiff and evidence involving the general society. *Thomas,* 414 F. Supp. at 264-65. We agree with the ruling of the *Thomas* court upholding this distinction. In the case before us, the post-accident evidence admitted dealt specifically with the actions of the defendant directly involving the plaintiff. Thus, our decision is consistent with the teachings of *Thomas*.

*Whyte v. Robinson, supra,* has little to do with the case before us. In it, the trial court permitted introduction of evidence of plaintiff's alcohol usage without adequate foundation, and the appellate court reversed because the obvious prejudicial nature of the allegation that the plain-

tiff was intoxicated far outweighed any probative value under the facts of the case. As with *Thomas,* we agree with the teachings of *Whyte,* but find it to be wholly distinguishable from the matter before us.

In light of the issue joined between the parties and their respective positions, defendant's alleged post-accident comments and observable demeanor suggesting a preoccupation with getting to his meeting were extraordinarily relevant to the questions presented to the jury.

Defendant next argues that even assuming, arguendo, this testimony was relevant, its prejudicial value outweighed its probative value. Merely because evidence is unfavorable to a party does not render it more prejudicial than probative. *Hutchison v. Luddy,* 763 A.2d 826, 847 (Pa. Super. 2000). Evidence is deemed to be prejudicial not because it hurts a party's case, but because it has an undue tendency to suggest that a decision be made on an improper basis. *Leahy v. McClain,* 732 A.2d 619, 624 (Pa. Super. 1999).

Defendant contends that the evidence he sought to exclude paints him as arrogant and callous, and thereby suggested that the jury make its decision on the basis of whether it liked or disliked defendant, rather than on the basis of the evidence presented in this case.

We permitted this evidence for all of the reasons that made it so relevant and probative. It was offered to prove the motive for defendant's actions, and thereby provide a rationale for what otherwise would seem to be wholly irrational conduct. It was offered also to contradict defendant's direct testimony refuting virtually every material fact of plaintiff's case. The reality that it was

offered before defendant testified because plaintiff presents her case first in our system of justice is of no matter. Prior to the trial, all involved knew defendant's position and the substance of his testimony.

We took care in our charge to make sure the jury did not decide this on the basis of personality. We told it in the first sentence of our charge that it was now part of the legal system and needed to treat all parties equally under the law. We then told the jury that it was not permitted to allow sympathy, emotion or prejudice to influence its decision. We made the same statement at the conclusion of our charge.

We are satisfied that the jury deliberated this case on a proper basis and delivered a lawful verdict. Any concern that the evidence offered by plaintiff through Openbrier and Berty tended to suggest an improper basis for the decision and was therefore prejudicial was far outweighed by the probative value of this evidence on the issue adjudicated.

Defendant's third averment of error contends that we abused our discretion by excluding the offered expert testimony of defense witness, Eugene Farber. Farber was an expert "in human factors and accident causation." Defendant desired to call Farber to testify about the ability of a layperson to estimate speeds in miles per hour.[5]

Pa.R.E. 702 provides as follows:

*"If scientific, technical or other specialized knowledge beyond that possessed by a layperson* will assist the trier

---

5. In addition to the various offers of proof throughout the record, see defendant's brief in support of motion to permit expert testimony of Eugene Farber, page 1.

of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise." (emphasis added)

As set forth in this Rule of Evidence, it has long been the law of this Commonwealth that: "[t]he purpose of expert testimony is to assist the fact-finder in grasping complex issues not within the knowledge, intelligence, and experience of the ordinary layman." *Commonwealth v. Begley,* 566 Pa. 239, 263, 780 A.2d 605, 621 (2001), (citing *Commonwealth v. King,* 554 Pa. 331, 367, 721 A.2d 763, 781 (1998) and *Commonwealth v. Auker,* 545 Pa. 521, 543, 681 A.2d 1305, 1317 (1996).

In the recently decided case of *Commonwealth v. Delbridge,* 771 A.2d 1 (Pa. Super. 2001), the defendant was convicted of the indecent assault of his two minor children. On appeal, he challenged the trial court's refusal to permit him to present expert testimony regarding the competence, taint and reliability of the child witnesses.[6]

In affirming the trial court's refusal to permit such testimony, the Superior Court noted that when a matter is easily understood by ordinary citizens, expert analysis is not required, and, indeed, permitting such testimony would infringe on the jury's right to determine credibility. *Id.* at 5-6.

---

6. We recognize that there is a special body of law applicable to child sexual abuse cases. However, the principles set forth in that body of law and in those cases are equally applicable to the matter before us.

There are few skills better known to an average person than those surrounding driving. This includes estimating the speed of cars all around each of us every day. Expert testimony attacking the estimates of speed provided by eyewitnesses such as these with ample experience and opportunity for observation is impermissible both because the subject is not beyond the knowledge and skill of a layperson and because to permit the testimony would intrude upon the jury's function of deciding credibility. The proper methodology for attacking such testimony is the time tested art of cross-examination and not through expert testimony.

Defendant attempts to distinguish this case arguing that what was presented was lay opinion evidence, and therefore it was permissible for defendant to call an expert to testify, contradicting the opinions expressed. What the witnesses testified to were factual estimates of defendant's speed from their personal observations based upon everyday experience. While an argument can certainly be made that these factual estimates are a type of "opinion," this does not make them any more difficult for a layperson to understand.

Lastly, defendant attempts to distinguish this case and assert the need for expert testimony by arguing that his vehicle was moving directly toward or away from some of the witnesses, that it is difficult to estimate speed from that perspective and that he should have been permitted to call an expert to explain this phenomena. Each of these witnesses had the opportunity to see defendant's vehicle from numerous views and angles as they watched it proceed from the four-lane portion of Route 50 to the scene of the accident. Thus, defendant's factual premise is in-

correct. Even if the witnesses had seen the car only from the front or behind, this would be a matter for cross-examination rather than expert testimony.

Defendant contends next that we erred in excluding the testimony of Steven Rickard, an expert in accident reconstruction, and in excluding a videotape of the crash of a Lexus SUV with a stationary barrier which Rickard would have authenticated.[7]

We turn first to the question of Rickard's testimony. Exactly what Rickard desired to say and the reasons therefore are somewhat amorphous. A fair reading of his testimony before the jury and relatively extensive voir dire leads us to conclude that he desired to make two points. First, he would have testified that because defendant was not seriously injured or dead he could not have been going more than 35 to 45 miles per hour. Second, that based upon the photographs and drawing on the police report, Morningstar's car and defendant's SUV would have had to collide twice in order to propel Morningstar's car into Spinosa's.

At trial, we were somewhat preoccupied by our desire to understand the precise opinions Rickard desired to present and the premises for these opinions. We eventually determined, for reasons explained below, that Rickard's testimony should be excluded on a substantive basis.

In reading the transcript, we have concluded that the complex analysis of what Rickard proposed to say and

---

7. We did not exclude this because of lack of authentication. The videotape was excluded because the accident depicted therein was wholly dissimilar from the one occurring in this case.

why the testimony was substantially inadmissible was unnecessary. The truth of the matter is that we should have excluded this testimony because it was not covered by his expert's report. Given the obvious corrections of this conclusion and the simplicity of this issue, we address it first.

Pa.R.C.P. 403.5(c) provides as follows:

"The direct testimony of the expert at trial may not be inconsistent with or go beyond the fair scope of his or her . . . separate report or supplement thereto."

The purpose of this rule is to prevent surprise and therefore unfair prejudice to the opposing party. *Tiburzio-Kelly v. Montgomery,* 452 Pa. Super. 158, 681 A.2d 757 (1996). If plaintiff had been advised through an expert report of the substance of Rickard's proposed testimony, she could have hired her own expert to contradict the highly technical basis for Rickard's opinion. She also could have meaningfully prepared for cross-examination. The lack of notice to plaintiff was therefore severely prejudicial, and this testimony should have been excluded on that basis alone. We turn next to why we would have excluded this evidence even if Rickard's report would have apprised plaintiff of his intended testimony. Pa.R.E. 401 defines "relevant evidence" as evidence having a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without that evidence. The 1998 comment to this rule instructs that a court is to apply reason, experience, scientific principles and consider the other testimony offered in determining the relevancy of proffered evidence.

Rickard testified forthrightly that he was unable to reconstruct this accident, and therefore could not opine as to the speed the vehicles were traveling at the moment of impact. Instead, he desired to testify, based upon statistical data, that defendant had to be going only 35 to 45 miles an hour or he would not have escaped uninjured from the accident.[8]

After full examination, however, it became apparent that Rickard could not even say this. At the conclusion of his voir dire, we asked him what we thought were obvious questions about the factors of the speed of Morningstar's car and the weights of the respective vehicles in computing the force at impact and therefore the level of violence. He responded that the speed of Morningstar's vehicle and the weights of the vehicles were very important. In fact, he said that his testimony was premised upon the formula that mass times velocity equals momentum, which translates into kinetic energy which, in turn, translates into velocity and speed.

Rickard did not know the weight of defendant's or Morningstar's vehicle, and had no idea of the speed of Morningstar's vehicle. Thus, in accordance with his own analysis, there was no relationship between his testimony

---

8. Interestingly, Rickard also desired to testify that 50 percent of all fatalities occur in accidents with speeds of less than 35 miles an hour to explain Morningstar's death. We cannot help but note the "heads I win, tails you lose" nature of this testimony. Because defendant was not going more than 45 miles an hour, he was unhurt, but because many fatal accidents occur at 35 miles an hour, Morningstar died. While we find the inconsistency distasteful, it was not a basis for excluding Rickard's testimony. Rather, it would have been a matter for cross-examination and consideration by the jury.

and the facts of this case, and therefore, his proposed testimony did not meet the definition of relevant evidence.

The same analysis is equally applicable to Rickard's proposed testimony concerning the angle of impact. As already stated, Rickard testified candidly that he could not reconstruct this accident. Thus, in reality, he had no idea of the positions of the vehicles at the moment of impact. To try to present evidence regarding this without any underlying data, Rickard proposed to opine that the police report was wrong. However, the police report was never put into evidence or relied upon by plaintiff. Thus, this was not rebuttal testimony. Under these circumstances, it was impermissible for Rickard to testify to the points of impact on both vehicles, which he did not know, by making argument that the points of impact as shown on the unadmitted police report were incorrect. As with the testimony concerning the speed of defendant's vehicle, this evidence had no factual basis related to this case, and therefore was not relevant.

Assuming, arguendo, Rickard's testimony regarding either the speed or the angle of the cars at the moment of impact had some threshold relevance, Pa.R.E. 403 provides that evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues or the misleading of the jury. As stated above, unfair prejudice refers to a tendency to suggest a decision on an improper basis. *Leahy v. McClain, supra.* Rickard's testimony would have done this. It would have suggested to the jury that defendant was going 35 to 45 miles an hour, when, in reality, Rickard had no idea how fast defendant was going. Similarly, Rickard's

desire to use the unadmitted police report's rough drawing as a springboard to argue that the vehicles must have hit twice when, in reality, Rickard had no evidentiary basis for testimony regarding the angle of the impact also would have suggested that a decision be made in this case upon an improper basis. Rickard's testimony would have confused the jury far more than it would have educated it.[9] Thus, it was properly excluded.

We turn next to defendant's contention that we erred in refusing to permit him to play a videotape of a smaller and lighter Lexus SUV than that driven by defendant hitting a stationary wall at 39 miles an hour. The law is clear that videotapes showing crash tests are properly admitted only if they depict conditions substantially similar to those existing at the time of the accident in question. *Jackson v. Spagnola,* 349 Pa. Super. 471, 476, 503 A.2d 944, 946 (1986).

Here, as set forth above, the Lexus in the videotape was smaller and lighter than defendant's vehicle. The collision was into a stationary barrier, rather than another moving vehicle, and at the conclusion of the collision in the videotape, the vehicle did not roll over, while defendant's vehicle rolled across the road. The videotape, in short, had little to do with the circumstances of this accident, and was properly excluded from evidence.

---

9. Indeed, while we did not go into the analysis at the time of this trial and do not want to do so now, Rickard's proposed testimony might well be a classic example of inadmissible junk science in the courtroom. *Frye v. United States,* 293 F. 1013 (App. D.C. 1923); adopted by Pennsylvania, *Commonwealth v. Topa,* 471 Pa. 223, 369 A.2d 1277 (1977).

Defendant alleges that we erred in three respects while charging the jury. First, he contends that plaintiff's counsel argued facts not in evidence during his closing, entitling defendant to a curative instruction which we denied. The following excerpt from plaintiff's counsel's closing spawned this request:

"Plaintiff's Counsel: Now do you remember when I got up to cross-examine Mr. Hoban? I pulled [sic] out to him prior testimony that he had given under oath and specifically drew his attention to the question that said,

"Question: When was the meeting to start?

"Answer: 11:30.

"I asked him, do you understand the word 'start'?

"Answer: Yes.

"Why did he now come into court many, many months later and say that the meeting started at 9 o'clock, but 'I wasn't going to get there until 11:30 even though the purpose of the meeting was to talk to these people?' Why did he say that? I submit to you, ladies and gentlemen, he said it because he found out in the interim when we got a copy of the schedule from the Sheraton that showed that the meeting started indeed at 9 o'clock and now smart, smooth and slick, he has to acknowledge now that 'It started at nine, but I wasn't going to get there until 11:30.' Even though the whole purpose of the meeting was for him to talk to the people of the school that he might be acquiring. And why did he remember Officer Openbrier at the hospital? He heard Mr. Hoban telling somebody on the phone, 'Do whatever you have to do to hold him there. Buy him lunch if you have to.' As Ms.

Meyer testified yesterday, that's exactly what happened. Lunch was never part of the program. And it seemed to be a common courtesy that if a meeting is going to start at 11:30, you might think about having lunch, but the reason that lunch was ordered was because it was never part of the original plan. That meeting was starting at 9 o'clock and starting means he's to be there because he's the one who's going to speak at the meeting." (N.T. 3/22/01, vol. I, pp. 731-32.)

Defendant testified on direct examination that the meeting at the Sheraton began at "8:30, 9, something like that . . . I had planned on getting there at 11:30." On cross-examination, defendant was asked to read into the record a portion of his testimony from his criminal trial where he responded affirmatively to a question verifying that the meeting at the Sheraton was to begin at 11:30 a.m. (T.T., 382-83, 429.) Plaintiff's counsel accurately reviewed these facts from the record in his closing, and then argued appropriately from them. Accordingly, defendant's argument on this point is without merit.

The second averment of error arose from our refusal to deliver a supplemental charge concerning the number of witnesses offered by each side during the trial. Our practice is to give this type of boilerplate instruction if either counsel requests it. Prior to the beginning of the charge, defense counsel stated that he did not desire this point for charge. Accordingly, we did not give it. After we had concluded our charge, defendant's counsel changed his mind because of plaintiff's closing, and asked us to instruct on this point.

Under these facts, defendant's counsel waived any objection. If it were otherwise, trial counsel could, as a matter of tactics, withdraw or not seek points for charge until after the court completed its instructions to the jury, and then demand an instruction to insure its emphasis in the minds of the jury.

Assuming, arguendo, that the objection was not waived, the instruction would have been cumulative. We told the jury to appraise the credibility of every witness individually and to decide which of the testimonies and which of the witnesses to believe. We told the jury also that in deciding whether plaintiff had met her burden of proof, it should consider all of the evidence from all the witnesses, regardless of whether those witnesses were called in plaintiff's case or defendant's case, and whether the evidence was elicited during examination, cross-examination, re-direct or re-cross-examination. Thus, giving an instruction regarding the number of witnesses would have added nothing to the substance of the charge.

The third averment of error in the court's charge concerned the instruction on punitive damages. Defendant contends that our charge failed to inform the jury that defendant must have had an appreciation of the risk he was creating before punitive damages could be awarded against him.

The most often cited case for the elements of proof necessary for the recovery of punitive damages is *Martin v. Johns-Manville Corp., supra,* discussed above. There is no question that in Pennsylvania punitive damages may be awarded for conduct that is outrageous. *Id.* at 1096, citing Restatement (Second) of Torts, §908(2).

For conduct to be outrageous, a defendant had to have acted either with bad motive or with reckless indifference to the rights of others. *Id.* It is the definition of "reckless indifference" that forms the basis of defendant's complaint with our charge.

The Supreme Court in *Johns-Manville* noted that comment (a) to section 500 of the Restatement (Second) of Torts described two types of reckless indifference. In the first, the actor must either know or have reason to know of facts creating a high degree of risk to another. In the second, the actor must know or have reason to know of facts which a reasonable man would believe created a high degree of risk to another. The distinction is obvious. Under the first test, the jury must decide whether this particular actor knew or had reason to know facts creating a high degree of risk of harm to the others. Under the second test, the question is whether a reasonable man in the actor's position would have known or have reason to know such facts, regardless of whether that particular actor did so.

In *Johns-Manville,* the Supreme Court reasoned that the public policy for the grant of punitive damages was to deter outrageous conduct, and that one could not be deterred from such conduct if he was not conscious of the risk. *Id.,* 508 Pa. at 171 n.12, 494 A.2d at 1097 n.12. Accordingly, the court determined that it did not further this policy to permit punitive damages if only the reasonable man standard described in the second scenario above was met. Accordingly, Pennsylvania adopted the requirement that a jury must determine whether a defendant *personally* knows or has reason to know that he has created a high degree of risk of physical harm to another.

Under this test, it matters not whether a reasonable man would have understood this.[10]

We understood this and explained it to the jury carefully instructing it as follows:

"The purpose of the awarding of punitive damages is to punish a defendant for his conduct and deter this type of conduct by the defendant or others in a similar situation in the future. Before you are permitted to award punitive damages, you must find that the conduct of the defendant is outrageous. Now outrageous means something.

"Let's do the definition. Outrageous in this context has a specific meaning. It means that the defendant acted either with bad motive or with a reckless indifference to the interest of others. A reckless indifference to the interest of others also has a definition, and I will try to do this because I recognize these are all difficult concepts and you're absorbing them.

"Reckless indifference to the interest of others is defined in the law surrounding punitive damages that the

---

10. But see *Taylor v. Albert Einstein Medical Center,* 723 A.2d 1027, 1037 (Pa. Super. 1998), and *Hall v. Jackson,* 2001 WL 1506037, 7, (Pa. Super. 2001). In these cases, the Superior Court appears to approve an analysis where the fact-finder determines whether the actor knew or had reason to know of facts which a reasonable man would believe created a high degree of risk to another. This is the test that was rejected in *Johns-Manville* and *SHV Coal.* All but one federal court applying Pennsylvania law in diversity cases have adopted the *Johns-Manville* approach. (See federal cases cited on page 37 hereof.) With the greatest respect to our brethren on the Superior Court, we followed the dictates of *Johns-Manville* and *SHV Coal* rather than those of *Albert Einstein Medical Center* and *Hall v. Jackson* at trial and continue to believe that it represents the law of Pennsylvania.

defendant acted with reckless indifference to the interest of others. *He either had to know or have reason to know that his actions created a high degree of risk of physical harm to another and notwithstanding, knowing or having reason to know that his actions created a high degree of risk of physical harm to another,* he deliberately proceeded to act or failed to act in a conscious disregard or indifference to that risk.

"In determining this, you are probing the defendant's state of mind based upon the facts. You may consider the seriousness of any potential harm in evaluating the evidence to the extent that the act of the defendant caused the potential injuries and consequences. The more serious the possible harm, the more the actor, the defendant here, is likely to perceive the risk of harm. That's the standard for an award of punitive damages.

"I'm going to try to do that one more time in short form, if I can.

"The purpose is to deter or to punish as we understand it. To award, you must find defendant's conduct is outrageous. *Outrageous in this context means either bad motive or with reckless indifference to others and reckless indifference in this context means that the defendant either had to know or have reason to know that his actions created a high degree of risk of physical harm to another* and nevertheless deliberately proceeded to act or failed to act in conscious disregard or indifference to that risk."

Defendant complains that this charge does not instruct the jury that he personally had to know or have reason to know that his actions created a high degree of risk of

physical harm, notwithstanding that the charge states this twice in language that has been approved by every court considering this issue. See *e.g., Martin v. Johns-Manville, supra; SHV Coal Inc. v. Continental Grain Co.,* 526 Pa. 489, 494, 587 A.2d 702, 704 (1991); *Burke v. Massen,* 904 F.2d 178, 181 (3d Cir. 1990); *Jones v. McDonald's Corp.,* 958 F. Supp. 234 (E.D. Pa. 1997); *Sealover v. Carey Canada,* 793 F. Supp. 569, 571 (M.D. Pa. 1992).

Defendant seems to center his argument on a discussion among the court and counsel prior to the charge. What was said in chambers during such discussion is of no moment. The only question is what was said to the jury. Our charge accurately and completely explained to this jury what it had to find before punitive damages would be awarded.

Finally, defendant argues that we erred by not adding to the portion of our charge explaining punitive damages the statement that negligence was not enough. We explained to the jury that plaintiff did not have a burden of proof regarding compensatory damages because defendant had admitted negligence, but that plaintiff did have a burden of proof regarding punitive damages because defendant denied plaintiff's entitlement to such damages. We completed the discussion of compensatory damages and told the jury that we next needed to turn to punitive damages emphasizing again that defendant denied owing punitive damages and that plaintiff had the burden of proving she was entitled to punitive damages.

We began the discussion of punitive damages by informing the jury that punitive damages are different than

compensatory damages and need to be explained fully in their own right. As already stated, during that discussion, we carefully reviewed the elements for punitive damages which were obviously very different than the concept of carelessness which we used to describe negligence. We are satisfied that our charge regarding punitive damages followed Pennsylvania law and fully explained the necessary concepts to the jury.

Defendant's final two arguments also concern the jury's award of punitive damages. Defendant concedes that evidence of net worth is permissible in punitive damages cases. See *Hoffman v. Memorial Osteopathic Hospital,* 342 Pa. Super. 375, 492 A.2d 1382 (1985). Nevertheless, defendant contends that a statement of his financial condition prepared on his behalf from information he supplied was improperly admitted because it was not an accurate statement of his net worth.

Plaintiff called Raymond W. Buehler, a CPA with Schneider Downs, a large and well-respected accounting firm. Buehler authenticated defendant's statement of financial condition and testified concerning it. Buehler first explained that the statement is a compilation of defendant's various financial statements. It was prepared by Schneider Downs based upon information provided by defendant, and was intended to be provided to institutions, such as banks, as evidence of defendant's net worth. The statement listed defendant's assets, subtracted his liabilities and set forth his positive net worth at $14,840,000.

Thus, the document represents defendant's admission, and was clearly admissible in this case. Defendant's ar-

guments that the document was not prepared in accordance with generally accepted accounting principles, did not take into consideration tax consequences and the like were, at best, matters for cross-examination, which we permitted.

Finally, defendant argues that the punitive damage award was excessive. Nothing could be further from the truth. Even after defendant pays this award, he will remain a multi-millionaire several times over. The jury's award was in conformity with the facts of this case, and it would be improper for a court to tamper with it.